1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF WASHINGTON
2

UNITED STATES OF AMERICA,        ) Case No. 2:25-MJ-454-JAG-1
3                                )
                       Plaintiff,  ) July 10, 2025
4                                ) Spokane, Washington
v.                               )
5                                ) **Digitally Recorded**
HECTOR SAUL IRAHETA-MERCADO,      ) Detention Hearing
6                                )
                       Defendant.  ) Pages 1 to 52
7    _____

8
                   BEFORE THE HONORABLE JAMES A. GOEKE
9               UNITED STATES MAGISTRATE COURT JUDGE

10
                          APPEARANCES:
11
     For the Plaintiff:          Ann Wick
12                               Ann.Wick@usdoj.gov
                                 Michael Ellis
13                               US Attorney's Office-SPO
                                 920 W Riverside, Suite 300
14                               P.O. Box 1494
                                 Spokane, WA 99210
15                               509-353-2767

16   For the Defendant:          Justin Lonergan
                                 Justin_lonergan@fd.org
17                               Micah Bartek (intern)
                                 Federal Defenders of Eastern
18                               Washington and Idaho
                                 601 West Riverside Avenue
19                               Suite 900
                                 Spokane, WA 99201
20                               509-624-7606

21   Spanish Interpreter:        Bea Rump

22   Official Court Reporter:    Kimberly J. Allen, CCR #2758
                                 United States District Courthouse
23                               P.O. Box 685
                                 Richland, Washington 99352
24                               (509) 943-8175

25   Proceedings recorded electronically; transcribed therefrom.

1    (Digital Recording/S-740; July 10, 2025)

2            THE COURTROOM DEPUTY:  Please rise.

3    (Call to Order of the Court)

4            THE COURT:  Good afternoon.  Please be seated.

5            THE COURTROOM DEPUTY:  Matter before the Court is *United*

6    *States of America v. Hector Saul Iraheta-Mercado*, Case

7    No. 2:25-MJ-454-JAG-1.  Time set for a detention hearing.

8            Counsel, please state your name for the Court and

9    record.

10           MS. WICK:  Good afternoon, Your Honor.  Ann Wick for the

11   United States.

12           THE COURT:  Ms. Wick, good afternoon.

13           MS. BARTEK:  Micah Bartek on behalf Mr. Mercado, with

14   supervising attorney Justin Lonergan.

15           THE COURT:  Ms. Bartek, Mr. Lonergan, good afternoon.

16           And Mr. Iraheta-Mercado, good afternoon.

17           Mr. Mercado --

18           THE DEFENDANT (through the interpreter):  Good

19   afternoon.

20           THE COURT:  Mr. Mercado, this is the time set for a

21   detention hearing.  Before we get into that issue, I want to

22   ask, are you able to understand me and the proceedings, with the

23   assistance of the interpreter?

24           THE DEFENDANT (through the interpreter):  Yes.

25           THE COURT:  Mr. Mercado, if at any point you cannot

1   understand the proceedings, please let the interpreter know, let

2   me know, let Mr. Lonergan know, or Ms. Bartek know.

3          All right?

4          THE DEFENDANT (through the interpreter):  That's fine.

5          THE COURT:  Mr. Mercado, as you are in court right now,

6   are you under the influence of illness, prescription

7   medications, drugs, alcohol; anything like that?

8          THE DEFENDANT (through the interpreter):  No.

9          THE COURT:  And last, Mr. Mercado, if at any point

10  something happens during the course of the hearing that causes

11  you to have a question or a concern and you would like a moment

12  to consult with your counsel privately, just let me know; we can

13  take a break and you can do so.

14         All right?

15         THE DEFENDANT (through the interpreter):  Okay.

16         THE COURT:  All right.  Ms. Wick, Government's motion;

17  I'd like to hear from you first.

18         MS. WICK:  Thank you, Your Honor.

19         Just as a housekeeping matter, I was going to proceed by

20  proffer, and then the defense has a video they'd like to play.

21         So do you still want me to incorporate kind of proffer

22  and argument or hear -- hear and see the video first?

23         THE COURT:  Yeah, I'd like to proceed by proffer, we'll

24  hear and see any presentation defense wishes to make, and then

25  I'll hear argument from both sides.

1          MS. WICK:  Thank you, Your Honor.

2          I can be fairly brief.  I'd ask the Court to take notice

3   of the affidavit, facts set forth in it in support of the

4   complaint, and I'll highlight a few of them.  And I'll slow down

5   a little bit for the interpreter.

6          I do have some photos to offer to the Court.  And why

7   don't I do that first.  A copy has been provided to the defense.

8   I have hard copies, if that's all right.

9          THE COURT:  Sure.

10         MS. WICK:  Government's Exhibit 1 and 2.  And to

11  identify them for the record, they are pictures of Deportation

12  Officer Waite's arm that we'll talk about in terms of being

13  trapped in the window during the process of making an arrest.

14         THE COURT:  Ms. Bartek, any objection to their

15  admission?

16         MS. BARTEK:  No objection.

17         THE COURT:  All right.

18         MS. WICK:  May I approach?

19         THE COURT:  So I'm looking at Government's Exhibit 1 and

20  2.

21         MS. WICK:  Thank you, Your Honor.

22         So what started, or what's kind of underneath what

23  ultimately resulted in the charges before the Court is a 2008

24  deportation order or order of removal that was entered in

25  absentia for the defendant.  I'm sure the Court's aware, but for

1    the record's sake, the orders in absentia come about whereby

2    someone is -- has been contacted; those -- immigration

3    proceedings are proceeding, but they are no longer showing up,

4    either at the hearings or the other check-ins, and so by the

5    time the order is entered, they are also not present.  And so

6    then the order is then served to their provided address that

7    they have previously given.

8            Since 2008 -- I wanted to reference the Pretrial

9    Services report, and the supplemental in particular, if the

10   Court would consider the information that's offered there from

11   the defendant's family member.  It's -- it's apparent he's

12   maintained a presence in the United States since 2008.

13   Obviously, he could have come and gone, but it appears, as he's

14   had employment history, he's had a residence, he has had a

15   romantic relationship and family ties since that order of

16   removal, and is still present here with the current status that

17   he has that's unlawful at this time.

18            Then we get to the date of the arrest and the underlying

19   criminal charges of assault.  When the deportation officers

20   initiate the traffic stop in furtherance of the arrest warrant

21   that they have that is based on that 2008 order of removal, they

22   contact the defendant on the side of the road.  And, again, I'm

23   mostly referencing from the complaint for the -- for the facts

24   that are set forth in there.  They contact the defendant.

25   Deportation Officer Waite, in particular, is the one at the

1   driver's side door.  And when he is identified and then ordered

2   or requested to step out of the vehicle, he does not.

3          Ultimately, it results in Deportation Officer Waite

4   putting his arm through the open driver's side window to try to

5   open that driver's side door, because the defendant is not at

6   that time exiting the vehicle.  And I would note, there are

7   passengers in the vehicle that are not identified by name in any

8   reports, but I think there may be a proffer as to who they are,

9   given that they're the source of the video, one way or the

10  other, that will be played.

11         There -- in response to placing the arm through the

12  window, the defendant rolls up his window.  And my understanding

13  is it's an electronic -- the car is new enough that it's an

14  electronic system we're dealing with, not a hand-crank.  He

15  rolls up the window, and he traps Officer Waite's arm in the

16  window.

17         From there, there is a moment where either the car is on

18  and it's kind of idling and he puts it into gear, or it's off

19  and the defendant puts the car on and puts it into gear.  But

20  it's very clear from the two deportation officers that the car

21  is placed into gear, based on what they've put in the affidavit

22  and in the -- in speaking with them yesterday.

23         So the car is put into gear, and -- and Officer Waite

24  has described like an eye contact moment with the defendant.

25  Ultimately, the defendant takes it back out of gear.  It's not

1    clear to me how long that takes, but there is some minutes

2    referenced before he eventually is -- is compliant in some

3    fashion.

4         He does not roll the window down to -- again, the video

5    will help clear up some of this, and I'm actually thankful the

6    defense has video to show, Your Honor.  But he doesn't

7    immediately roll down the window.  He doesn't voluntarily leave

8    the vehicle.  The officer -- deportation officer has to get a

9    window smashing device and smashes out first the passenger

10   window, to try to effectuate getting Officer Waite's arm out of

11   the window, and also, ultimately, getting the defendant out of

12   the vehicle.

13        They actually get a seat belt cutter when they --

14   when -- I can't think of the other officer's last name.  I

15   apologize.  His first name is Andrew.  But when he is trying to

16   cut the seat belt, the defendant swats his arm away, and they

17   eventually get him out of the vehicle.  Even after outside the

18   vehicle, he is not compliant.  He is physically resisting

19   arrest.  You can see him pull his arms kind of away from being

20   handcuffed; that sort of thing.  Again, the video will help

21   display a lot -- a lot of these behaviors.

22        So -- and then, of course, I provided the photographs.

23   Those were taken same day, is my understanding.  You can see in

24   Government's Exhibit 2 the marks that were left from the window

25   where the arm was pinned there kind of in the biceps area and

1    some of the other abrasions that are a result.

2          Deportation Officer Waite did go to seek medical

3    attention and get cleared.  It will be a time will tell if

4    there's any more than the damage that is kind of visible in the

5    pictures.

6          And then I'll reserve argument, Your Honor.

7          THE COURT:  Thank you.

8          MR. LONERGAN:  Your Honor, just, may I clarify that

9    proffer very quickly?  I don't know if I heard it, but

10   Ms. Wick -- was the Government proffering that the defendant

11   actually received -- actually received notice of the deportation

12   order?

13         MS. WICK:  The short answer is yes, based on my

14   understanding of the immigration proceedings where the order was

15   issued and the -- and because he had been previously

16   participating in some fashion or previously notified, then the

17   order would have been served at the last known address.  So

18   that's what I'm proffering it based on.

19         MR. LONERGAN:  But the Government is not proffering any

20   type of certified receipt or actual evidence of confirmed

21   receipt of the order?

22         MS. WICK:  I cannot proffer that.  I haven't seen it.

23         MR. LONERGAN:  All right.  Thank you.

24         THE COURT:  But if an order is entered in absentia, does

25   that not mean that the individual who is the subject of the

1    order has stopped participating in the process that was ongoing

2    at the time?

3            MS. WICK:  That is my understanding, which is --

4            THE COURT:  They just stopped showing up.

5            MS. WICK:  That is my understanding, which is why I

6    wanted to make sure I referenced it.  And I can tell the Court

7    and counsel, I specifically asked about that.

8            THE COURT:  So whether -- whether they were aware of the

9    order or not, they were aware that they were participating in an

10   immigration process and then stopped participating.  So the fact

11   that there's going to be consequences from that is certainly

12   within the realm of possibilities.

13           MS. WICK:  Correct.  I would agree with that, Your

14   Honor.

15           THE COURT:  Mr. Lonergan, do you want to hook up the

16   video to the Court's ...

17           MR. LONERGAN:  Yes, Your Honor.

18           Before I play the video, I just have a couple other

19   details to proffer for the Court.

20           Mr. Mercado has received four years of education in his

21   home country of El Salvador.  And, actually, if I may, just --

22   before plugging that in ...

23           In arriving in the United States and after 2008, he

24   continued to file federal income taxes.  He maintained contact

25   with the State of Washington for purposes of child custody

1    support.  He maintained a valid Washington state driver's

2    license.  Those are just some additional details that I would

3    ask the Court to take note of, history and characteristics.

4            THE COURT:  Well, he has no -- I mean, I've read the

5    supplemental Pretrial Services report, the initial Pretrial

6    Services report.  He has no criminal history to speak of at all.

7            MR. LONERGAN:  Right, Your Honor.  And -- right.

8            THE COURT:  As I -- as I read it, he's never even --

9    he's never been removed.

10           MR. LONERGAN:  No.

11           THE COURT:  There wouldn't -- and there wouldn't have

12   been a basis for a 1326 case.

13           MR. LONERGAN:  No, Your Honor, he hasn't.

14           Your Honor, this is the video of what actually happened.

15       (Video then was played.)

16           THE COURT:  Yeah, we don't have it on ...

17           MR. LONERGAN:  Oh, it's showing on this one.

18       (Pause in proceedings.)

19           THE COURTROOM DEPUTY:  Let me see if I can get IT down.

20           MS. WICK:  If it's at all helpful, I've seen this, and

21   if you need to view it on counsel's laptop at the bench, I'm

22   also fine with that.  I've seen it.

23           THE COURT:  Sometimes the cord at the bottom of the

24   podium will come undone, so -- that's an IT thing, so ...

25           MR. LONERGAN:  For the record, I didn't break it.

1          THE COURT:  I think I broke it when I moved the podium.

2          THE COURTROOM DEPUTY:  IT (inaudible).

3       (Pause in proceedings.)

4          THE COURT:  Ms. Wick, any objection to admission of the

5    video exhibit?

6          MS. WICK:  No, Your Honor.

7          THE COURT:  We'll call that Defense 1.

8          MR. LONERGAN:  Yes, Your Honor.  I'll get it filed after

9    court this afternoon.

10          THE COURT:  It sounds like it's a cell phone video.

11          MR. LONERGAN:  It is, Your Honor.

12       (Discussion held off the record regarding IT issue.)

13       (Pause in proceedings.)

14          THE COURT:  Mr. Lonergan, do you have the image on your

15    screen?

16          MR. LONERGAN:  I do -- I do, Judge.

17          THE COURTROOM DEPUTY:  We had it for a second.

18          MR. LONERGAN:  For a second.

19       (Pause in proceedings.)

20       (Discussion held off the record regarding IT issue.

21       (No audio sound.)

22          IT TECH:  Anything?

23          THE COURT:  It's green.

24       (Pause in proceedings.)

25          THE COURT:  Mike, we can just play it off of the -- we

1    can just play it off the laptop, too.

2          Mr. Lonergan, do you want to just play it off the laptop

3    here?

4          Overcome and adapt.

5          (Inaudible discussion.)

6          (Whereupon a video clip was played.)

7          THE COURT:  So, Mr. Lonergan, if you could file that as

8    a nonscannable.

9          MR. LONERGAN:  Yes, Your Honor.

10         Nothing further on the proffer.

11         THE COURT:  Any additional materials or proffer you'd

12   like to make?

13         MR. LONERGAN:  The only thing I'll note, Your Honor, is

14   Mr. Mercado's family being in attendance.  They were also here

15   yesterday.  So we are two for two for them showing up to his

16   court appearance to support him.

17         Thank you.

18         THE COURT:  Mr. -- Ms. Wick has left us.  Mr. Ellis,

19   you're subbing in?

20         MR. ELLIS:  Yes, Your Honor.

21         Just to make sure I'm on the same page as everyone else,

22   I think it sounds like both parties have now proffered various

23   information, and is the Court now anticipating --

24         THE COURT:  Yes.

25         MR. ELLIS:  -- argument?

1     THE COURT:  The Government has proffered two photos of

2  Officer Waite's arm.  They have been admitted.  Defense has

3  proffered the video.  The video has been provisionally admitted,

4  subject to the nonscannable being filed.  And the Government has

5  also proffered the complaint affidavit.

6     MR. ELLIS:  Okay.  Thank you.

7     THE COURT:  I've reviewed the PSR -- or the Pretrial

8  Services report and the supplemental Pretrial Services report.

9     MR. ELLIS:  Thank you, Your Honor.

10     Well, I think, in having now watched -- watched the

11  video with the Court and counsel, I think the video, in large

12  part, speaks for itself about why the Government is seeking

13  detention here.  You know, Mr. Mercado refused many, many

14  demands to comply with the immigration officers attempting to

15  execute his arrest; pinned Officer Waite's arm in the window,

16  and despite being told many, many times to release the window,

17  declined to do so.

18     When he did so and Officer Waite reached in to try and

19  turn off the car, because, again, the car was on and he was

20  refusing to turn off the car, you could see Mr. Mercado swatting

21  at Officer Waite's arm and, then again, pinned his arm in the

22  window, which means that the window went down to release him and

23  then it went back up to re-pin him in the window.

24     So -- yeah, and then obviously once removed from --

25  resistance to being removed from the car, and then you could see

1    visible resistance to being detained outside the vehicle.

2          So, again, the video largely speaks for itself as to

3    Mr. Mercado's efforts to avoid being taken into custody by the

4    ICE officers on scene.  And that goes to, in large part, the

5    factors the Court is meant to consider under 3142 concerning

6    detention.

7          You know, the reality is at this point Mr. Mercado has

8    been, after having this older removal order outstanding for a

9    long time, which, again, it was issued in absentia so there's at

10   least a -- to do that, my understanding, at least the Government

11   has to provide some notice to the immigration court that the

12   person had notice the Court -- of the hearing that they then did

13   not appear at, to have that in absentia order issued.  If that

14   order was issued, that is at least a presumption that

15   Mr. Mercado had the notice that would have been required for the

16   immigration court to issue that.

17         THE COURT:  My understanding is -- and I could be wrong,

18   but my understanding is when an absentia order has been entered,

19   a process had begun and either the person stopped attending that

20   process -- the person was engaged with the immigration courts

21   system at some point or another and then, for whatever reason,

22   stopped engaging with that process.

23         MR. ELLIS:  Yeah.  Based on, again, my limited

24   experience, mostly in the 1326 context, dealing with folks who

25   have had in absentia orders, it requires that.  It's, you've

1   absented yourself from the process, similar to --

2           THE COURT:  It had begun, though.  I mean --

3           MR. ELLIS:  It had begun.  Yeah, you don't -- there has

4   to have been a process and some kind of missed engagement or

5   missed date for that order to be triggered.  And you must -- and

6   you have to have notice of that or else if you don't have

7   notice, they can't issue it either, because there's due process

8   issues with that.  So, again, that's -- that's a concern.  And

9   then obviously it was apparently outstanding for a long -- a

10  long period of time.

11          But now we are in a situation where Mr. Mercado knows

12  for sure that he is back on Immigration's radar, and his

13  behavior when learning that he was back on that radar is very

14  indicative of someone who is not likely to comply with that

15  process, which means he's not likely to comply with this Court's

16  process or the district court's process, and to act in a way

17  that endangers potentially officers and other people in the

18  community if he's needed to be taken into custody again.

19          This is a problem that we've recently addressed with the

20  Court in a different matter concerning when people engage in

21  resistive and disruptive conduct when -- with the goal of

22  avoiding or inhibiting or doing something to stop a lawful

23  arrest or detention, and those situations are dangerous; they're

24  dangerous to law enforcement and they're dangerous to --

25          THE COURT:  They're dangerous to everyone involved.

1      MR. ELLIS:  -- the community.

2      And here, you know -- I mean, that was -- I didn't

3 actually see how long the video was, but it must have been at

4 least three-or-so minutes of pretty continuous resistive,

5 noncompliant conduct that was inside the car and outside the car

6 and required officers to break multiple windows of the car and

7 pinned an officer's arm in the window on a -- what appeared to

8 be two occasions; certainly based on the dialog, two occasions.

9      So I think from -- from the perspective of, you know,

10 you have an individual who, now that he is fully aware he's

11 going to be back on Immigration's radar, is going to be heavily

12 incentivized to avoid any of this process because the end result

13 of that process is going to be removal from the United States.

14 And so that -- that consequence is, for someone in Mr. Mercado's

15 situation, of great consequence, perhaps, in some ways, a

16 greater consequence than what may happen out of any criminal

17 case that arises from this complaint.

18      And, you know, the Court has before it, admittedly a

19 limited sample size, but a sample size of how Mr. Mercado deals

20 with being engaged in the immigration process, which is

21 apparently doing something that triggered this in absentia order

22 back ten-plus years ago, and then when re-engaged with

23 Immigration a day or so ago, behaving as he did in the video.

24      And so based on -- based on that record, it's the

25 Government's position that the Court can find that, by a

1    preponderance of the evidence, Mr. Mercado is not likely to, or

2    at least cannot reasonably assure the Court that he's going to

3    comply with any of this process, which means he's not likely to

4    come back to court, if released.  And if -- certainly in a

5    scenario in which law enforcement had to again, be it the

6    Immigration or the United States Marshals, if this criminal case

7    went to, you know, completion and he was out of custody and

8    needed to be taken back into custody, knowing that after the

9    United States Marshals, whatever BOP time there may be or jail

10   time, Immigration comes next, you know, Mr. Mercado's conduct is

11   indicative of how dangerous that situation may be, if the Court

12   were to release him and he needed to be taken back into custody.

13          So, with that, you know, the video speaks for itself and

14   that level of noncompliance and resistive behavior and active

15   harm to officers attempting to perform an arrest that they are

16   allowed to do, detention is appropriate pending -- pending

17   trial.

18          Thank you.

19          THE COURT:  Thank you.

20          Mr. Lonergan.

21          And, Mr. Lonergan, do you have a different understanding

22   of the absentia order?  It seems to me that, at a minimum, the

23   process had begun, and for whatever reason, Mr. Mercado did not

24   complete the process and an order was issued.  Whether he

25   received notice of -- the absentia order was entered or not, he

1    stopped engaging with that immigration process.

2          MR. LONERGAN:  My concern is the last part of that

3    comment, of him stopping engagement with that process, because

4    what we have here is a -- typically, my understanding, a

5    multiyear process where over that course of time there's a lot

6    of assumptions that have to hold up for this process to be

7    reliable, including notice going to where somebody actually is.

8    And that's a real problem with people who are -- whether they're

9    law students moving in different apartments or people who are

10   just working seasonal work and perhaps changing address over the

11   course of several years, I think --

12         THE COURT:  You still know a process was going on.

13         MR. LONERGAN:  I mean, you do -- you do --

14         THE COURT:  You get a traffic ticket and -- and you

15   don't -- your address is wrong and you don't get a notice from

16   the court, but you still know you got a traffic ticket.

17         MR. LONERGAN:  I would agree with you to the extent that

18   we are all sitting here talking about this with jurist doctorate

19   degrees from an Anglo American totally social upbringing.  We're

20   talking about someone who has four years of education, and if

21   they aren't getting process consistently over several years,

22   these things sometimes seem like they die on the vine because

23   they do.  We know that administrative law judges are overworked,

24   overwhelmed, and these cases are not always processed in a

25   timely or an efficient manner.  And so at some point could

1  somebody reasonably believe "I guess nothing is happening of

2  this," I think that's a very fair thing.

3          I get plenty of stuff from VA a year and a half later

4  where it's just like, "I thought this was done."  And -- and

5  that's, unfortunately, how the federal government works in a

6  bureaucracy.

7          So I think we need to be very, very careful --

8          THE COURT:  It didn't end with a green card.  It didn't

9  end with legal permanent residency.  It didn't end with

10  naturalization.  It didn't end with any of those things.

11          MR. LONERGAN:  Well, but it did continue with him --

12          THE COURT:  It didn't stop.

13          MR. LONERGAN:  Well, but it did continue with him

14  remaining patently engaged with all forms of government,

15  including paying federal taxes, including being engaged with the

16  state, including being engaged with the court system as far as

17  child support.

18          So, you know, there is a certain element of this that --

19  that has to be viewed in the entire life context of a person,

20  that if you've got one part of you that is handling this

21  immigration issue, you're also responding to the same federal

22  government paying them money and processing things and there's

23  nothing coming of it, I think there's a zone for normal people

24  who are not lawyers to believe that, "Okay, I think this is

25  done" or at least -- and you're right, there's no green card out

1  of it, but that's very different than saying he's ignoring the

2  court process.  That's very different than saying he's turning

3  his back to the process.

4          If someone just doesn't understand it, that's a very

5  different thing than flight risk.  And that's my real concern

6  here, is how many hundreds of thousands of these are processed

7  every year, and we expect that every one of these is done right,

8  timely, and everybody understands them?

9          No.  That's -- that's just not how the real world works.

10  And when you have a record of somebody who has -- I think

11  Probation really kind of went to good lengths to really point

12  this out in the Pretrial Services report, just showing all those

13  connections that he's had over the past 20 -- 18 years since

14  this in absentia proceeding.  I think that's pretty inconsistent

15  with somebody who's dodging the system.  That's my concern.

16          THE COURT:  Oh.  Oh, if -- if -- absent the arrest

17  conduct, there wouldn't be a basis for a detention hearing, I

18  don't think.

19          MR. LONERGAN:  Right.  But now we're assuming that he

20  must have been ignoring the court process for 18 years.  That's

21  my concern here is --

22          THE COURT:  Well, let's set that aside.  I mean, if law

23  enforcement mistakenly pulls you over, you still don't have

24  license to physically engage with them.  You got to comply with

25  their --

1          MR. LONERGAN:  So if I can --

2          THE COURT:  -- directives.

3          MR. LONERGAN:  So if I can kind of talk about that, I

4    was coming out of Judge Rice's courtroom about three weeks ago,

5    and there was another case coming out of Judge Pennell's, and

6    the gentleman was out of custody, clean dressed, clearly had

7    been out of custody, and family seemed happy.  And then a couple

8    agents came up to him --

9          THE COURT:  Was this in Richland?

10          MR. LONERGAN:  I'm sorry?

11          THE COURT:  Was this in Richland?

12          MR. LONERGAN:  Upstairs, Your Honor, just upstairs.  And

13    the agents explained to him they were -- they were here to

14    arrest him.  He had just successfully finished court and was

15    being arrested.

16          And what I have to point out about those agents is that

17    they went into a -- you know, an unknown situation with how that

18    person was going to respond, and they handled it with

19    communication, de-escalation, and respect for understanding that

20    this was going to be a huge shock to an individual.  Those

21    officers did it right.

22          I'm -- I know our folks have a hard job, but, Judge,

23    this was the exact wrong way for them to handle this situation.

24    And that's why this shouldn't be used as kind of the death knell

25    against Mr. Mercado because, honestly, the government really

1    escalated this situation, created a highly volatile --

2          THE COURT:  Isn't the Government going to say it was

3    escalated when the agent's arm got pinned in the car?

4          MR. LONERGAN:  No, Judge.  You had two individuals who

5    come up in plain clothes whose badges are barely visible, and I

6    would say we know where to look for those badges because we are

7    used to seeing them, but if you have somebody who has no idea to

8    think that they're about to be arrested on a deportation order

9    from 18 years ago, you got a couple of plain-clothes guys who

10   are coming up, flanking you on the side of the road and blocking

11   you from doing anything, that is going to start escalating the

12   situation.

13         You then proceed to these officers who -- you heard the

14   tone of their voice, you heard the volume of their voice.  We

15   have non -- you have these officers giving legal commands to a

16   non-English speaker.  And what's the response?  You have people

17   in the back in English asking:  What is this about?  I don't

18   understand.  What is going on?  And these officers' responses

19   are to reach into the car, to physically invade a person's

20   space, when they're trying to understand what has just happened

21   to them, and then all of a sudden you got another guy coming

22   around pointing a firearm at you, and then another firearm.

23         I hope the Court saw --

24         THE COURT:  I did see that, but as I saw it, the firearm

25   came out after the arm was pinned in the window.

1          MR. LONERGAN:  I have some disagreement over how the --
2    do we really escalate to deadly force at that point?  That's
3    excessive.  These officers didn't try to de-escalate this
4    situation at all.  They came in hot, and it was the wrong
5    approach.  They clearly had somebody who was panicking and
6    had -- and they made no effort to try to tone down the
7    situation.
8          Instead, what they tell him is he's going to shoot you.
9    And, Your Honor, if we look at officer-involved shootings, one
10   of the things that the research shows us is that officers
11   involved in high-stress incidents routinely focus on the threat
12   rather than the peripheral things that are going on.
13         So if you look at that video, what you see is a man with
14   no criminal history, no violent history, not really aware of
15   what's going on, and he's looking back and forth between these
16   two guns that are being pointed straight at him.  You have these
17   guns being flagged -- I mean, the weapon control is shocking,
18   that this -- that Officer Waite has this gun covering everybody
19   in this car.  It was a -- it was a dangerous situation that the
20   government escalated.
21         And why do I bring that up?  Because we have to look at
22   the fact that if this was a unique situation, really, that got
23   out of hand too fast, is that predictive of how he's going to
24   act with the assistance of counsel through this process, in a
25   hopefully supportive pretrial context?  I'd say no, because

1    that's the record that is before the Court.

2         Your Honor, again, I appreciate these guys have a tough

3    job to do, but when you have someone who's trying to communicate

4    with you, step back.  Step back and say, "Hang on, you know,

5    Hector.  This is -- this is getting a little bit hot for a

6    minute," and talk to the people who are in the car who speak

7    English and say, you -- "Look, I have a warrant.  I will show

8    you the warrant.  What I just need is for your dad to calm down

9    for a minute so that we can talk to him and explain this

10   situation."

11        That's how you handle that.  You don't go cowboy on

12   people who aren't expecting and have no reason to be expecting

13   that they're going to be arrested on the side of the road, after

14   participating in all the essential parts of society for the past

15   16 years.  That's -- the concern here is whatever may come of

16   this case -- right? -- we -- the Government didn't have this

17   video.  We -- we did.  We provided it.  And, you know, there's

18   parts of it that are not good for Mr. Mercado, but there's parts

19   of it that tell the truth about how this situation didn't have

20   to happen this way.

21        And when you create a volatile situation, sometimes you

22   get a volatile reaction.  That's my point here.  And when we

23   start with conditions, and we actually tell the person, "I want

24   you to be successful.  Here's somebody to help you through the

25   process," we are far, far more likely to see the controlled

 1  positive outcome that we are looking for.

 2       I just -- I think of those officers upstairs who -- it

 3  might have -- it might have been these guys.  You know, they

 4  worked through a difficult situation because they're trained to

 5  de-escalate.  We count on them to de-escalate.  That's not what

 6  happened here.

 7       The arrest circumstances in this case were a one-off in

 8  the documented record of this person.  He is not a flight risk.

 9  All of his ties are thorough and deep to his community, to his

10  family, which are all here.  He deserves a shot at pretrial

11  release.  The Court, as Pretrial Services noted, has the

12  opportunity for GPS monitoring.  He's got the means to work.  He

13  has a living situation, all those things that predict he will be

14  successful, and really, just be doing what he's been doing the

15  last 16 years, which is working hard and taking care of his

16  family.  And if there needs to be accountability, he'll address

17  it.

18       But I'd tell the Court, this is an issue that I look

19  forward to discussing with the district court judge because I

20  think it needs to be talked about more.  So, you know, we are

21  going to -- we are going to vigorously fight for him to make

22  sure that there is a fair understanding of this, and I think

23  that that's going to incentivize him to appear.

24       THE COURT:  Isn't that a counterincentive, too, in the

25  sense of his immigration record is light, you know, an order in

1    absentia.  So prior to these charges, there was something to

2    talk about in immigration proceedings.  But if he gets convicted

3    of this offense, I think that would be considered an aggravated

4    felony; it would be a significant barrier to -- to future

5    status.

6              MR. LONERGAN:  It could --

7              THE COURT:  Isn't that right?

8              MR. LONERGAN:  It could be, Your Honor.  And --

9              THE COURT:  Does that incentivize somebody, if you

10   really don't want to --

11             MR. LONERGAN:  Well, what also incentivizes is the fact

12   that we live in a modern, digital world where now jurors can see

13   and decide for themselves --

14             THE COURT:  Oh, sure.

15             MR. LONERGAN:  -- if something is excessive force or

16   not.  And I really think that this is -- this is a concern on

17   this case.  And, you know, I'm going to be retaining an expert

18   to look at the application of force, because these officers are

19   trained.  So, you know, he's got rights here, valuable,

20   important trial rights, that -- we're kind of speculating --

21             THE COURT:  That will be thoroughly, I'm confident --

22             MR. LONERGAN:  Absolutely.

23             THE COURT:  -- thoroughly litigated at the district

24   court level.

25             MR. LONERGAN:  Oh, but that gives you an incentive to

1   be -- to be treated the right way.  Because what happened

2   upstairs goes back to something fundamental:  If you're treated

3   with dignity and respect, you participate.  And that's why that

4   person upstairs, having just come out of court a free man,

5   didn't fight the marshals, didn't fight the agents; he complied.

6   Right?

7          And it's the same thing for Mr. Mercado.  If we treat

8   people with dignity and respect and enforce the standard,

9   enforce the law, that's fine.  But if we treat them with that

10  respect, and we give them an opportunity, and we let them be

11  heard, then people are more likely to participate and accept the

12  outcomes if there is an outcome like that.  We --

13         THE COURT:  Is there any video or information of what

14  happened prior to the traffic stop?

15         MR. LONERGAN:  I don't have anything.  I don't know if

16  the officers in this case had dash cams or anything like that.

17  But, you know, when I hear somebody who's -- and I look -- and I

18  look at his body reactions and try and understand, and trying to

19  speak -- you know, the officer says to him, "You're resisting

20  arrest," and his response is -- is unintelligible --

21  unintelligible because it's Spanish; he's not understanding.

22         And all of us here will say, you know, when you're in

23  this situation, you're supposed to just -- what? -- step back

24  and be passive and just take it.  That's -- that's not the real

25  world.  It's just not.  And I ask the Court to just take that

1    into account, not because we're excusing anything, but we're

2    understanding how a dynamic situation got out of control.

3    That's really what we're seeing with this.

4         And a record that lacks any kind of violence, any kind

5    of abuse, any kind of substance abuse, instability, a very

6    boring record suggests that this is someone who is amenable to

7    conditions and who is invested in the community and wants to

8    participate in it.

9         Did I answer your question, Your Honor?

10        THE COURT:  Yeah, I think so.

11        Mr. Ellis.

12        MR. ELLIS:  Thank you, Your Honor.

13        So I think -- to start off, I think Mr. Lonergan's world

14   is described as one in which officers are expected to just take

15   their lumps while arrestees can have a bit of a pass to act out

16   a little bit when being arrested, and that's ridiculous.  This

17   was a traffic stop.  Getting pulled over.  You know it's a law

18   enforcement contact of some kind, and yet, this is the reaction.

19   It's not as though -- like, he wouldn't -- wouldn't have pulled

20   over if it was just a random car without any -- any -- like, how

21   would they have pulled him over?  It's a traffic --

22        THE COURT:  I mean, I did hear a request for --

23        MR. ELLIS:  -- stop.

24        THE COURT:  -- a warrant, which is indicative to me that

25   people in the car knew it was a law enforcement stop.

1       MR. ELLIS:  And, like, that video is not -- you know,

2  when you watch the video, it doesn't start when, you know,

3  everyone pulls over, and it's not -- you're missing the

4  beginning.  It starts with the resistive behavior.  It starts

5  with Officer Waite's arm pinned in the window.  So the idea that

6  the officers, they escalated that beyond anything, you know,

7  being drugged down the highway is a pretty legitimate fear when

8  your arm is pinned in the window and the driver of the vehicle

9  will not take it out of drive.

10      Why -- why else is the other officer standing in front

11  of the vehicle?  He's attempting to do what he can to stop

12  that -- like, turn off the car; turn off the car; turn off the

13  car.  Why are they saying turn off the car?  Because they don't

14  want Officer Waite to be drug down the highway as he's pinned in

15  the window of the vehicle.  That's why it's escalated, because

16  it's a very legitimate moment of danger for the officers.

17      So, again, the idea that the officers escalated this,

18  there -- there -- it's responsive.  Escalate begets escalation.

19  Someone pins the officer's arm in the window, will not turn off

20  the vehicle, that is escalation.  And when you escalate, you get

21  escalation in return because you're not complying with the

22  directives that you're being given, which are not particularly

23  complicated.  You've just been pulled over.  Turn off the car.

24  Get out of the car.  Like, they're -- you're being pulled over

25  by law enforcement.  Don't roll up the window on the guy's arm,

1    don't swat away at his hand when he's trying to reach over and

2    turn off the car.  Don't then re-pin his arm in the window.

3    Don't resist being taken out of the vehicle.  Don't resist being

4    handcuffed on the side of the road.

5         These are choices.  There's no mystery about what is

6    happening here.  It's a law enforcement contact.

7         So I looked up the in absentia statute.  It's 8, USC,

8    1229(a)(B)(5) about what has to be shown before an in absentia

9    order can be issued.  And it says an alien who, after written

10   notice, under other subsections, has been -- Title -- the

11   immigration code, Title 8, have been provided to the alien or

12   the alien's counsel of record does not attend a proceeding under

13   this section shall be ordered in absentia if the service

14   establishes by clear, unequivocal, and convincing evidence that

15   the written notice was so provided and that the alien is

16   removable.

17        Those are a lot of evidentiary sounding words that the

18   Government has to show to get one of these orders issued.  So I

19   think that just based on the legal requirements to have one of

20   those orders -- I think that there is an alternative as well

21   where the service doesn't -- where if the person failed to

22   update their address, then one can be issued.

23        But, again, that -- you know, two sides of the same

24   negative coin.  Either the person had notice and didn't turn up

25   or they didn't comply with their requirements to keep their

1    address updated with the service, both of which go to -- to a

2    negative inference concerning nonappearance here.

3            THE COURT:  Well, it goes to a reasonable inference that

4    one would know there are immigration proceedings back in -- may

5    have been a long time ago, but there were still immigration

6    proceedings that were unresolved.

7            MR. ELLIS:  And so I think, ultimately, it also comes

8    back to -- you know, the reality of this situation is that

9    Mr. Mercado, now knowing that -- after an apparently lengthy

10   amount of time out in the community on this in absentia removal

11   order, that time is over.  You know, he is back on Immigration's

12   radar; they have detained him.  He's heavily incentivized to do

13   what happened when that in absentia order was issued and in one

14   form or another not comply with the requirements that he was

15   supposed to in that proceeding, and do what happened the other

16   day, which is act out when Immigration or another law

17   enforcement body attempts to take action on a lawfully issued

18   process.

19           And so -- and based on the reality of the situation, and

20   now that he's back on Immigration's radar, and he knows that,

21   there's no question that he knows that at this point, he's going

22   to be heavily incentivized to comply neither with that process

23   nor this process, because the end result of both is removal to

24   El Salvador.

25           So with that, the Government again asks that the Court

1    detain Mr. Mercado pending further proceedings in this matter.

2         THE COURT:  Thank you.

3         Mr. Lonergan, I'll give you a brief opportunity to

4    respond.

5         I mean, Mr. Ellis makes the point, which I think is

6    self-evident, that the video is not the entire interaction with

7    law enforcement.  It doesn't have the traffic stop.  It doesn't

8    have the law enforcement initially coming up to the car.

9    Doesn't have any communications before that.  But it is clear

10   that people in the car know it is law enforcement because

11   there's questions about a warrant.  It's not, why is this

12   happening.  It's, "Do you have a warrant?  Do you have a

13   warrant?"

14        They say they have a warrant.  "I'll show you the

15   warrant later.  There's back and forth on that issue.

16        So, I mean, people seem to know it's law enforcement.

17        MR. LONERGAN:  Well, I think there's still a lot of room

18   for confusion on this, because if someone gets pulled over and

19   then all of a sudden, you might think it's a law enforcement

20   stop -- right? -- but then all of a sudden you've got two guys

21   in plain clothes who are not in Douglas County Sheriff's Office

22   uniforms coming up to you, "Hey, license and registration.

23   You're speeding."  Okay.  Right?  Very different than, "Get out

24   of the car.  You're under arrest."

25        Whoa.  Where did that come from?  Completely different

1    courses.  So I think the video actually shows, in fact, the

2    product of what happens when someone is not clear when --

3    they're not clear why they're getting pulled over.  So --

4            THE COURT:  Isn't there another reasonable inference,

5    though, that -- I mean, you know you don't have legal status in

6    the country, you know you were subject to an immigration

7    proceeding years ago -- it was a long time ago, but you're aware

8    of what is going -- what the current -- what current affairs are

9    in this country.  It's well known and well discussed in the

10   press for months now that there is a heightened emphasis on

11   immigration enforcement by the new administration.  People are

12   aware of that.

13           So if you are a person who, "I know I have this

14   immigration thing in my background.  I'd hoped that it was --

15   died on the vine and was resolved; there's no more interest in

16   me."  But now you're pulled over by law enforcement and they say

17   they have a warrant, I mean, I think it might cross your mind

18   that, "maybe it's immigration officers."  And now, because of

19   this renewed emphasis on enforcement, that is who it is, and "I

20   don't want to go with them."

21           MR. LONERGAN:  Interesting point, because actually, if

22   you listen to the -- I think it's Officer Williams, the bigger

23   one on the right, he doesn't say anything about immigration

24   until about two-thirds of the way through when he finally starts

25   being responsive to the kids trying to understand what the

1    situation is about.

2          So I think it's a little more vague than the Court is

3    appreciating when someone gets arrested -- when someone gets

4    stopped and all of a sudden it's just, "Hey, you have a

5    warrant."

6          "For what?"

7          I think that's a very reasonable response.  And then you

8    saw what happened afterwards, is they ask a bunch of questions.

9    These officers don't want to engage in a conversation, and it

10   becomes physical.  Right?  That's my point here, is no one wants

11   to see violence, no one wants to see violence with officers, no

12   one wants to see people in the car hurt.  But these officers

13   made no effort to try to de-escalate this thing from the

14   beginning.  Step back and just --

15         THE COURT:  Well, we don't have any information about

16   the beginning.  We have information about the point at which --

17         MR. LONERGAN:  Well, I --

18         THE COURT:  -- it got violent, the point at which the

19   officer got stuck in the -- his arm stuck in the window --

20         MR. LONERGAN:  Well, I -- and I --

21         THE COURT:  -- and Mr. Mercado rolled it up.

22         MR. LONERGAN:  After the officers going in and reaching

23   into his space and physically invading his space, when the

24   family is trying to converse with them.  They are trying to have

25   a --

1          THE COURT:  Trying to converse by rolling up your

2     window.

3          MR. LONERGAN:  Well, but you're also not trying to

4     converse by sticking your hand into somebody's car when you have

5     three people in the back who are trying to have a conversation

6     with you.

7          There was absolutely no urgency for those officers to

8     just not take a second and just say, "Everybody chill.  Let me

9     explain what is going on."  That is -- that's what they're

10    supposed to be doing.  They're trained to do that.  Actually,

11    it's DOJ policy, and they're supposed to be doing that.

12         But that -- that option was available to them throughout

13    this entire process.

14         THE COURT:  But Mr. Mercado had options, too.

15         MR. LONERGAN:  And he was trying to talk to the

16    officers.

17         THE COURT:  He was rolling up his window.  It's not

18    indicative of trying to talk to the officers.

19         MR. LONERGAN:  And that -- and you know -- and, Your

20    Honor, I --

21         THE COURT:  There's a question about whether the car is

22    in gear, on the side of a busy road.  The option -- I mean, he

23    had options, too, to respond in a different way to this.

24         MR. LONERGAN:  I agree with you.  And I think that

25    that's all the more important that we expect the highly trained

1  people to step back and diffuse the grenade.  Step back and just

2  say, "Whoa.  This is getting out of control.  I'm the trained

3  one.  I'm the one who is actually trained to monitor my breath,

4  monitor my pulse, stay calm in this situation.  I clearly have

5  somebody who is freaking out.  I need to get control back in

6  this situation."

7       You know, these are -- this is -- there's a lot of stuff

8  going on in these encounters, and that's why these officers are

9  trained to de-escalate.  It's -- it's a key part of this, and it

10  avoids situations like this.  Because when you start having

11  someone engage in conflict that doesn't get resolved or

12  diffused, what happens?  Right?  It's just more and more primal

13  brain.  It's just more and more instinct and less reason.  And

14  that's my -- I have a real problem with that, where we have

15  officers who could have stopped this and just said to the kids,

16  "Hey, you speak -- you speak Spanish.  Here's what is going on.

17  Your dad has a warrant" --

18       THE COURT:  But, also, as the Government says, what is

19  also going on is the car is going in and out of gear.  The one

20  officer said, "Take it out of drive," something to that effect.

21  The window is going up.  You have an officer's arm pinned in the

22  window against a busy road.  We saw semis going by.

23       MR. LONERGAN:  Right.  Right.

24       THE COURT:  The concern is the vehicle is going to

25  leave, and now we're in a more dangerous situation.  We have

1    bystanders in the vehicle.  What happens if a high-speed crash

2    ensues, the person leaves the stop, and then it escalates?  More

3    people are in danger, more people on the road who aren't even

4    involved in the incident are in danger.

5            MR. LONERGAN:  But we've seen this before where someone

6    is getting it from got angles.  You've got the officer on the

7    right who's literally screaming at Mr. Mercado, and then you've

8    got the officer on the left who is giving him not a

9    complimentary command, and so you've got him trying to reach

10   down.  And in -- you can see this in the video.  Like, he's --

11   he's reaching down, and then the gun is coming up.  Right?  The

12   gun is being pointed at him.  And what do we know about that?

13   In a risk situation, someone's focus becomes on the threat.  And

14   the threat in that situation is a firearm within feet of you, a

15   firearm that is within inches of your head and that's being

16   flagged to everybody in the car.

17           He's -- he's not thinking in his right mind in that

18   situation.  That's why you're trained to take the step back and

19   prevent it from getting to the point of flight, because we know

20   that, even as the Government said, escalation begets escalation,

21   and the government needs to stop that.  That's why they're

22   trained to stop that.

23           THE COURT:  The -- in some ways what you're -- what that

24   logic says is the government just shouldn't arrest people

25   because it's --

1          MR. LONERGAN:  No.

2          THE COURT:  -- an inherently escalatory thing when

3    someone gets taken into custody.  They're -- people don't want

4    to go into custody.

5          MR. LONERGAN:  No, Your Honor.  I mean, how many

6    encounters do we have that are perfectly de-escalated situations

7    that we see on body camera day in and day out here, where the

8    officers go in there and just say, you know, "You've got a

9    warrant, man."

10          And it's, like, "For what?"

11          And they explain it to them.

12          THE COURT:  Or the person is just compliant with the

13    arrest.

14          MR. LONERGAN:  I agree.

15          THE COURT:  And then they're explaining what happened

16    after their arrested.

17          MR. LONERGAN:  Right.  But when you're explaining it to

18    somebody in Spanish, who has four years of education, you might

19    need to do a little bit more before you pull out your pistol.

20    It's -- it's just --

21          THE COURT:  Well, the pistol came out when the officer's

22    arm was trapped in the window.  That's when the pistol came out.

23          MR. LONERGAN:  After the officer is reaching his arm in

24    there aggressively and --

25          THE COURT:  To turn the vehicle off.  I mean, I --

1        MR. LONERGAN:  But that's why -- that's why -- that's

2   really my point here, is you have this situation that's such a

3   volatile and ambiguous situation.  I -- there's things the

4   Government can point to, there's things I'm obviously pointing

5   at.  The question is:  Is that predictive?

6        And I would say no, it's not, because the circumstances

7   that we're going to be dealing with through the course of this

8   case, they're not going to be that volatile.  They're going to

9   be more, "Okay, you have Court this day" --

10       THE COURT:  I think the Government is saying that

11  Mr. Mercado's reaction could be -- could be attributed to the

12  fact that he does not want to go into immigration custody

13  because he does not want to be removed from the United States.

14  I understand that.  But you can't use force to resist that.

15  That increases the danger for everybody involved, including the

16  people who are just passing by on the side of the road.

17       MR. LONERGAN:  And I get that, Your Honor.  And to the

18  extent that he needs to take this situation, should the Court

19  release him, and understand that, like, hey, the expectation is

20  that you have this situation; you need to handle it differently.

21  Right?  This is --

22       THE COURT:  It's one thing to say -- it's one thing to

23  do a do-over -- right? -- when someone doesn't show up for a

24  summons.  It's another thing to do a do-over when somebody has

25  already resisted law enforcement.

1          MR. LONERGAN:  I would say when we're talking about a

2     preponderance, more than not -- you know, certainly the risk is

3     there, but does it say more than not that this is going to

4     happen?  I'd say no, when you debrief this with him --

5          THE COURT:  There's also the question of clear and

6     convincing evidence about risk of danger to the community.  If

7     people -- we've seen this play out.  People are very

8     incentivized not to be removed from this country.  I understand

9     that.  But people are incentivized in such a way they're using

10    violence to avoid that result.  So ...

11         MR. LONERGAN:  Well, and if there's any evidence of

12    firearms.  There's no evidence of firearms.  He's not able to

13    buy --

14         THE COURT:  But there is resisting two law enforcement

15    officers.  The badges could be seen.

16         MR. LONERGAN:  I disagree with the Court on that.  I

17    think that badges are less visible to somebody who doesn't have

18    a lot of law enforcement contact.

19         THE COURT:  The fact that people are asking in the car

20    for a warrant, they knew it was law enforcement.  It was known

21    that it was law enforcement who was there.  They said they had a

22    warrant.  And there's -- and we have physical resistance.

23         MR. LONERGAN:  I appreciate that, Your Honor.  My point

24    is this is more ambiguous than a situation of somebody having a

25    really clear understanding of things, and my thought on this is,

1   you've got someone whose now gone through this.  We've had the

2   opportunity to calm down and take a closer look at this the day,

3   two days after it all happened and say, "Okay, this is where

4   things went wrong.  Part of the problem was you really didn't

5   understand what was going on.  We're going to solve that problem

6   by explaining this process to you and working with you through

7   the process."

8          It's -- I think there's a huge difference when somebody

9   goes through this process with help, with an advocate, someone

10  to explain this process to them and to -- and to guide them

11  through it.

12         The other point I would just mention, too, is this idea

13  that someone is now more than ever incentivized to -- to not

14  show up, I disagree.

15         THE COURT:  I release people, a number of people who

16  have -- who do not have legal status in the country, and some --

17  some have chosen to cut the bracelet off.  Some have chosen to

18  comply and come back.  It's an individualized assessment.

19         MR. LONERGAN:  It is.  And -- and I know the Court has

20  been concerned about this in the past.  And so, actually, if we

21  look at the last year of information, there were 288 cases

22  activated for Pretrial Services -- excuse me, 283 cases.  Of

23  those 283 cases, four failures to appear.  Four.

24         THE COURT:  Those numbers are from what?  In this

25  district?

1            MR. LONERGAN:  This district, Your Honor.  This

2    district.  It doesn't happen as much as we think it does.  It's

3    a legitimate concern, Your Honor.  I've had that case where

4    someone has cut off the bracelet.  It is exceptionally rare.

5            THE COURT:  Well, the fact that that has occurred in

6    other cases is not -- I'm not holding that against Mr. Mercado.

7            MR. LONERGAN:  No.

8            THE COURT:  But --

9            MR. LONERGAN:  No.  And that's why it's reasonably

10   assure, is because the bracelet is an evidence-based condition

11   that has been proven time and time again across an entire system

12   to work as a condition of release.  There's -- he's got access

13   to it.  His family is highly incentivized to see him through

14   this process.  If somebody is -- has got seven months left, I'd

15   suggest that they're probably more likely to just spend an awful

16   lot more time with their family than to spend time trying to

17   figure out how to get back and flee to the country where they

18   haven't been for 28-or-so years.

19           THE COURT:  I don't -- I don't see the risk -- the risk

20   really -- the risk that's been articulated to me, and I think

21   accurately so, I think -- if the Government came in and said the

22   risk is he's going to flee to El Salvador, that's not the risk.

23           MR. LONERGAN:  No, I don't think that's the risk.

24           THE COURT:  The risk is he might flee somewhere else in

25   this country to avoid the consequence of being removed to El

1    Salvador.  That's the risk.

2         MR. LONERGAN:  Yeah, I just don't think there's any

3    connections anywhere else to suggest that that's a real risk

4    more than just a theoretical risk.

5         THE COURT:  Which goes back to if this case does not go

6    well for him, if he's released, and this case does not go well

7    for him, and the marshals have to go out and arrest him, and the

8    consequence of that is then removal, why is he going to act

9    differently than he did this time?

10        MR. LONERGAN:  Well, because somebody has an

11   understanding of the process.  I mean, we -- we do draw the line

12   in the sand that when someone comes into the court, is advised

13   of the consequences, is advised of the process, that's an

14   intervention -- right? -- right then.  And there is a judge

15   looking at this individual telling them, "These are my

16   expectations of you through this process."  And, again, they

17   have the assistance of somebody at that point.

18        THE COURT:  Society's expectations are that you're not

19   going to physically resist law enforcement.  That's a legitimate

20   expectation in society.

21        MR. LONERGAN:  I also suggest, Your Honor, society's

22   legitimate expectation is that trained officers also find a way

23   to just make a situation not become as volatile as it did.  You

24   know, that's what we saw upstairs.

25        THE COURT:  You don't get to fight with the officers if

1    they yell at you.  I mean, that's not how it works.

2            MR. LONERGAN:  And I appreciate that, Your Honor.  I

3    just think it's more complicated than the Court is giving it

4    credit for.  And that's yesterday.  The point is now we have

5    someone whose arraigned, who has counsel appointed for him, who

6    is going to be explained through this process.

7            I don't know what is going to happen to him in the

8    future, obviously, but I think there's a very different calculus

9    two days ago than there is with today's posture.

10           And we're talking about reasonable assurance, and we

11   have conditions that are very much accessible to the Court, GPS

12   restrictions, and if the Court's really --

13           THE COURT:  The reality is, and I'm not taking this into

14   account because there's Ninth Circuit case law that says I

15   cannot, but the reality is release -- release is not really on

16   the table.  The reality is the executive on the other -- the

17   immigration side of the executive would likely take Mr. Mercado

18   into custody and initiate removal proceedings.  Release is not

19   really on the table.

20           MR. LONERGAN:  And I understand that, Judge.  And I'm a

21   Red Sox fan, but if my Red Sox pitcher pitches to the Yankees a

22   ball, I hope it's called a ball.

23           THE COURT:  No, I --

24           MR. LONERGAN:  Right?

25           THE COURT:  Yeah.

 1          MR. LONERGAN:  That's really what we're looking for
 2   is -- and if the executive --
 3          THE COURT:  That's why we're engaging in this procedure
 4   because --
 5          MR. LONERGAN:  Right.
 6          THE COURT:  -- I don't -- I don't consider what the
 7   immigration proceeding is going to -- going to do or not.  I
 8   don't even know if there's a detainer in place or not.  I have
 9   no idea.
10          MR. LONERGAN:  I don't either, actually.  And so the
11   point is we're talking about what seems like a different tier of
12   enforcement.  I've seen a few cases like this, both here and in
13   Idaho recently, where it seems the enforcement priority at first
14   was of folks who may have a serious violent criminal history,
15   and it seems that the enforcement focus may now just be anybody
16   who doesn't have a status.  And --
17          THE COURT:  But that was always a possibility.
18          MR. LONERGAN:  It was always a possibility, sure.
19   Always a possibility.  But those -- if that's the priority, then
20   it's a much broader net, and I don't know if that's going to
21   trigger immigration holds for a potentially vastly larger
22   demographic.  I don't know.
23          And the Court's right, we shouldn't consider it.  What
24   we should do is tailor conditions that, you know, if Mr. Mercado
25   gets to walk out of Spokane County Jail, the conditions are

1  realistic.  And those conditions, I'd suggest, are GPS

2  monitoring, frequent check-ins with Probation.  And that GPS

3  monitoring is an active -- as I understand it, it's an active

4  system.  So, you know, if there's any hint of an issue, then

5  there's a quick response.  If the Court feels like that is not

6  enough, home confinement is a restriction.  It just -- keep him

7  at home.  Right?  That's probably just as good.

8          I don't think it's necessary.  I think that's a little

9  bit too restrictive.  But if that's where the Court's

10  sensitivity is, and obviously we can -- he'll make the best of

11  it.  But I think if we're calling this for what it is, we have a

12  situation that was really just out of the ordinary for this

13  individual.  We're at a different stage in the proceedings where

14  there's a different calculus for him to appear.  And with

15  that -- I appreciate there's evidence on the other side.  It's

16  just not there to the point where we detain him.

17          Thank you.

18          THE COURT:  Thank you.

19          So the factors I have to consider, the nature and -- I

20  mean, hearing no argument that there's not a basis for a

21  detention hearing, I think there -- there clearly is a basis for

22  a detention hearing under 3142(f)(1).  So the question then is

23  the nature and circumstances of the offense.  The nature and

24  circumstances of the offense, they're serious.  As the

25  Government said, the video is helpful, it's instructive, but

1    it's only part of the contact.  And there are aspects of the

2    video that do cut both ways.

3            But, at its essence, it does show Mr. Mercado being

4    noncompliant with people who were law enforcement.  They

5    appeared to be law enforcement.  The people in the vehicle

6    treated them as law enforcement; they asked for warrants.  They

7    were law enforcement.  And they -- and they obviously were law

8    enforcement.

9            And the nature and circumstances of the offense was

10   Mr. Mercado was resisting them.  That's serious.  That weighs in

11   favor of detention.

12           The weight of the evidence is the least important

13   factor.  The weight of the evidence, based on Government's

14   Exhibit 1 and 2 and Defense Exhibit 1, I know there's

15   significant argument to be made at -- at the district court

16   level, but the weight of the evidence appears to weigh in favor

17   of detention as well.  We have injuries that are evident to one

18   of the officers and definitely impeding conduct that is

19   reflected on the video.

20           History and characteristics of the defendant.  Aside

21   from this incident, he's had no, that I am aware of, no criminal

22   contacts in the United States at all.  He's been working.

23   Whether legal or not, he's been working.  He's been a member --

24   a person present in our society who has not had engagement with

25   criminal law.  That's positive.  It just absolutely is.

1      But, as you said, Mr. Lonergan, a couple days ago we

2 had -- he's on video resisting law enforcement in the course of

3 their legal duties.  He may not like the reason they're stopping

4 him, he may not like the result of why they're stopping him, but

5 resisting with physical force is not a legitimate option.

6      So the concern then becomes, as the Government has

7 articulated, what happens if he were to be released by this

8 Court and was able to walk out of the courtroom, what happens if

9 this case doesn't go well, what happens if Immigration comes

10 down a few days later and just seeks to implement the removal

11 order?  Will there be resistance again?  That's the concern.

12      And then last is the nature and seriousness of the

13 danger posed to any other person or the community if he were

14 released.  He does not appear to pose a danger to the civilian

15 members of the community in general or at all.  But he does

16 appear to pose a danger if placed in a situation where law

17 enforcement is going to detain him with a potential consequence

18 of removal.  And that's on the table now.

19      Many other people are faced with that exact same

20 situation and choose not to resist law enforcement physically.

21 When people resist law enforcement physically and have a vehicle

22 at their disposal, the potential for a chase to ensue, other

23 members of society to be endangered, it's very real, it's very

24 present, and it's certainly happened in the past.

25      Unfortunately, choices do have consequences.  And the

1   most recent choice that Mr. Mercado made, when confronted with

2   law enforcement seeking to take him into custody, was to resist

3   them physically.  So I think the Government has -- and I think

4   Mr. Mercado has demonstrated that he's incentivized and he does

5   not want to be removed from this country.  I understand that.

6   And there's avenues to -- to resist that that are perfectly

7   appropriate, and he has every right to engage with those

8   avenues.  But the avenue of physical resistance is not one of

9   them.  It's just not a right afforded him under the

10  Constitution.

11         But the right that is afforded him is to engage with the

12  immigration process and to seek -- pull all those levers

13  available to him in that civil process.  And the record the

14  Government has presented is he at one point -- he had started

15  that process, but at one point stopped that process.

16         But I think the Government has established by a

17  preponderance there is a risk of nonappearance here sufficient

18  for detention.  I think the Government has established by

19  Mr. Mercado's actions that there's clear and convincing evidence

20  that the defendant would be a danger to the community if he were

21  not detained.  Law enforcement officers are members of the

22  community.  There's not a free pass to assault law enforcement

23  officers -- particular law enforcement officers from particular

24  agencies because people don't -- a person may not like what

25  they're doing.  That's just not a choice either.

1    There are laws of the land that people may or may not

2    like, but choosing to resist it with violence is not -- is not

3    an option.

4         So I'm going to grant the Government's motion for

5    detention.

6         But if you wish to appeal, Mr. Lonergan, the Government

7    is on a short timeline to present this matter to a grand jury.

8    I'll have a district court judge assigned soon.

9         And I'd ask you to file that nonscannable, too, so we

10   have a complete record.

11        MR. LONERGAN:  Yes, Your Honor.  I'll get the

12   nonscannable filed and get it to the Government.

13        THE COURT:  I mean, the reality is I don't know that

14   there's -- there likely is some immigration charge the

15   Government could have charged Mr. Mercado with if he had not

16   resisted arrest, not charging him with 111.  And if that had

17   happened, given Mr. Mercado's record, absent what he chose to do

18   when confronted with arrest, there wouldn't have been, I don't

19   think, a basis even for a detention hearing, based on his record

20   and conduct.  He doesn't have failures to appear.  He doesn't

21   have a bunch of conduct -- or any law enforcement conduct.

22        It's -- we're here and the calculus is such as it is

23   because of how Mr. Mercado chose to react with this situation

24   with law enforcement, and reacting with violence and resistance

25   and physical resistance is just -- it's not an option that this

1    Court will condone.

2            So the Government's motion is granted.

3            Oh, yeah.  And, Mr. Ellis, Ms. Wick presented

4    Government's Exhibit 1 and 2.  Could you file those with ECF so

5    if an appeal is appropriate -- or is taken, that that record is

6    clear on the --

7            MR. ELLIS:  Yes, Your Honor.  I'll pass that along to

8    Ms. Wick.

9        (Audio recording ended; 3:56 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        C E R T I F I C A T E

2

3          I, KIMBERLY J. ALLEN, do hereby certify:

4          That I am an Official Court Reporter for the United

5   States District Court for the Eastern District of Washington in

6   Richland, Washington;

7              That the foregoing proceedings were taken on the date

8   and at the time and place as shown on the first page hereto; and

9              That the foregoing proceedings are a full, true, and

10  accurate transcription to the best of my ability after listening

11  to the official electronic sound recording of the requested

12  proceedings, duly transcribed by me or under my direction.

13          I do further certify that I am not a relative of,

14  employee of, or counsel for any of said parties, or otherwise

15  interested in the event of said proceedings.

16          DATED this 26th day of August, 2025.

17

18

19                        */s/ Kimberly J. Allen*

20                        Kimberly J. Allen, CRR, RMR, RPR, CCR
                          Washington CCR No. 2758
21                        Official Court Reporter
                          Richland, Washington
22

23

24

25