1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| 1 | | |
| 2 | UNITED STATES OF AMERICA, ) | Case No. 2:25-cr-00116-MKD-1 |
| 3 | ) | |
| | Plaintiff, ) | July 28, 2025 |
| 4 | ) | Spokane, Washington |
| | vs. ) | |
| 5 | ) | Digital Recording: |
| | HECTOR SAUL IRAHETA-MERCADO, ) | Motion Hearing |
| 6 | ) | |
| | Defendant. ) | Pages 1 - 33 |

BEFORE THE HONORABLE JAMES A. GOEKE
UNITED STATES MAGISTRATE COURT JUDGE

APPEARANCES:

For the Plaintiff:          ANN T. WICK
                            U.S. Attorney's Office
                            920 W. Riverside Ave., Ste. 300
                            P.O. Box 1494
                            Spokane, Washington 99210

For the Defendant:          JUSTIN P. LONERGAN
                            Federal Defenders of Eastern
                            Washington & Idaho
                            601 W. Riverside Ave., Ste. 900
                            Spokane, Washington 99201


Court-Certified Interpreter:  Bea Rump

Official Court Reporter:      Allison R. Anderson, RMR, CRR, CCR
                              United States District Courthouse
                              P.O. Box 700
                              Spokane, Washington 99210
                              (509) 458-3465




Proceedings recorded electronically; transcribed therefrom.

1        (Court convened on July 28, 2025, at 2:22 p.m.)

2        THE COURTROOM DEPUTY:  The matter now before the Court

3   is *United States of America versus Hector Saul Iraheta-Mercado*,

4   Case No. 2:25-cr-116-MKD-1; time set for detention review

5   hearing.

6        Counsel, please state your name for the Court and record.

7        MS. WICK:  Good afternoon, Your Honor.  Ann Wick for

8   the United States.

9        THE COURT:  Ms. Wick, good afternoon.

10       MR. LONERGAN:  Good afternoon, Your Honor.  Justin

11  Lonergan for Mr. Iraheta-Mercado.

12       THE COURT:  Mr. Lonergan, good afternoon.

13       Mr. Mercado, good afternoon.

14       Mr. Mercado, this is the time set to revisit the question

15  of detention.  We're going to have that hearing in just a

16  moment.  Before we do that, I want to ask you are you able to

17  understand these proceedings with the assistance of the

18  interpreter?

19       THE DEFENDANT:  Yes.

20       THE COURT:  Okay.  If at any point you can't

21  understand with her assistance, let her know, let Mr. Lonergan

22  know, let me know.  All right?

23       THE DEFENDANT:  Yes.

24       THE COURT:  Then as you are in court right now, are

25  you under the influence of illness, prescriptions, drugs,

1   alcohol, anything at all that would affect your ability to

2   understand the proceedings today?

3              THE DEFENDANT:  No.

4              THE COURT:  Okay.  And last, Mr. Mercado, if at any

5   point something happens that causes you to have a question, a

6   concern, and you'd like a moment to talk to Mr. Lonergan

7   privately, just let me know.  We can take a break, and you can

8   do so.  Okay?

9              THE DEFENDANT:  That's fine.

10             THE COURT:  All right.  Mr. Lonergan, it's your

11  motion.  I'd like to hear from you first.  And I've read all the

12  materials submitted, and I reviewed that second exhibit as well.

13             MR. LONERGAN:  Perfect.

14             MS. WICK:  Can I make a record regarding the second

15  exhibit?

16             THE COURT:  Sure.

17             MS. WICK:  So I don't usually object to a whole heck

18  of a lot in the detention scope, but I do object to Exhibit B on

19  the basis that it is a memo by Spokane Police Department where

20  the events in question occurred outside of the Spokane Police

21  Department jurisdiction, where it didn't involve Spokane Police

22  Department officers, where the memo is directed at responding to

23  these immigration incidents and interactions.

24             THE COURT:  In general.

25             MS. WICK:  In general, and with federal law

1  enforcement individuals.  And I think the date occurred -- the

2  date of the memo is actually after the date of offense in this

3  particular case.  And then lastly, because the Spokane Police

4  Department's guidance is not applicable in this circumstance.

5  Thank you.

6         THE COURT:  Thank you.

7      Mr. Lonergan, your response to that, the objection issue?

8         MR. LONERGAN:  May I come --

9         THE COURT:  Sure.

10         MR. LONERGAN:  Your Honor, my response is that this

11  entire motion to reconsider is based on appropriately placing

12  this case in context.  We are supposed to look at the nature and

13  circumstances of the alleged offense, and what -- this policy

14  caught my eye.  I don't know if the Court saw this.  It was in

15  the *Spokesman*, and it struck me as very pertinent to some of the

16  issues we started talking about last time where it was a

17  question of tensions, reactions, encounter reactions, and

18  encounter counter-reactions.

19         THE COURT:  As I understood the exhibit, it goes to

20  some of the aspects of your argument at the prior hearing

21  talking about deescalation and things of that nature.

22         MR. LONERGAN:  It does, Your Honor, because what I --

23  what I gather from Chief Hall's response, which I think is very

24  pertinent to Spokane, as it is Tri-Cities, Wenatchee, New York

25  City, Dallas, LA, anywhere else, is that there's a real concern

1  right now that things are happening with a lot of tension in our

2  communities and that everybody on competing sides is not taking

3  a step back and saying, "How do we calm this down a bit?"  And

4  Chief Hall's -- I'm not offering this to be critical.  I'm

5  offering it just to say, yes, it's after the fact because we

6  have this thing pressure-cooking for the last few months, and

7  now we're starting to see this really boil over.

8        It really boiled over with the *Hatfield* indictments.  It's

9  really boiled over with this case, some that Mr. Powers Beggs

10 has introduced.  The Court's seeing this, right?  And that's why

11 this policy is offered is just to say, hey, people are starting

12 to take notice that we're -- we could be handling this a little

13 better way and --

14       THE COURT:  I understand why you would want to

15 reference it.  I will consider it.  Ms. Wick can argue that I

16 give it the weight that she thinks is appropriate, and you can

17 argue I give it the weight that you think I should give it.

18       MR. LONERGAN:  Yes.  Thank you, Your Honor.

19    And Your Honor, I really want to address kind of three

20 points that I've really been thinking about a lot since our last

21 hearing.  The first point is the Court's discussion at the end

22 of Mr. Iraheta's hearing where the Court said violence is just

23 not something this Court can ever condone.  The second thing I

24 want to talk about is how Mr. Iraheta might react if we

25 approached with the benefit of some of the context that we're

1  seeing.  And then the third thing I want to talk about is a few

2  more details on the immigration side of things.

3      Violence is not -- is not the way we solve these problems,

4  and I think everybody probably agrees on that, but what is

5  really important is taking an incident and deciding if this

6  thing that went wrong is really predictive of how somebody on

7  release is going to violate.  And I suspect that that was at the

8  heart of the Court's decision in Mikki Hatfield's case, is that

9  he obviously had some serious charges, but now that he's under

10  federal supervision under conditions, under that sanction, that

11  deterrent effect, the Court made a decision that this is

12  unlikely to happen again.  And I suspect that if we really look

13  at this for Mr. Iraheta-Mercado's case, it is a stronger

14  conclusion to believe that Mr. Iraheta-Mercado is not going to

15  be that danger as perhaps the Court was concerned about last

16  time.

17      What I think Chief Hall's memo gets at is that there is a

18  lot of fear, a lot of uncertainty from a certain part of our

19  population, and I suspect that's what happened in this case.

20  Having had the benefit of looking at the discovery, Your Honor,

21  Mr. Iraheta-Mercado was stopped for no -- essentially, no reason

22  other than the warrant.  I looked at the discovery.  There was

23  no traffic violation.  These officers approached him in an

24  unmarked vehicle.  They asked only for his license.

25      He is driving a vehicle, as he lawfully should have.  I can

1  represent to the Court I've seen his vehicle registration.  It's

2  in his name.  I've seen his driver's insurance.  It's in his

3  name.

4       From the perspective of somebody who's being stopped and

5  pulled over, there is a tremendous amount of uncertainty.

6  That's the context for what happened in this case.  And, you

7  know, surprise doesn't generally get a good reaction.  It just

8  doesn't.

9       Now, law enforcement chose to stop him on the highway,

10  which they have the prerogative to do, but they were also

11  observing him at his home.  And there is a certain element of

12  dangerousness that is accepted in the -- in automobile stops.

13  We talk about this in kind of giving officers some discretion.

14  But I just -- I have to underscore how this was just a perfect

15  storm of some officers probably trying to do their jobs.  Okay.

16  Mr. Iraheta-Mercado reacted a certain way.  But when we look at

17  the context of him being stopped for something that he -- this

18  detainer that he may not have even known about, it doesn't

19  present --

20            THE COURT:  But he did know he didn't have status in

21  this country.  I mean, he has no document --

22            MR. LONERGAN:  True.

23            THE COURT:  He has every reason to believe he does not

24  -- he did not finish the immigration process.  The government's

25  proffer was it's somewhat difficult to get an absentia order.

1  So it is -- it's a reasonable proposition that he did not

2  know -- he knew he does not have legal status in this country.

3  And we all know by watching current events that in the last

4  four, seven -- seven months, there's been a heightened -- six

5  months, there's been a heightened emphasis on immigration

6  enforcement.  So people are concerned about that if they don't

7  have legal status in this country.  I totally understand that,

8  totally understand that.

9        MR. LONERGAN:  Sure.  But that's also against the

10  backdrop of existing in a country for 20-plus years, obtaining

11  valid legal documents, valid commercial documents, and then

12  being pulled over for -- I think we can all agree --

13        THE COURT:  Those documents -- whether the state of

14  Washington chooses to allow people who don't otherwise have

15  legal permanent resident status or legal status in the country,

16  if the state of Washington allows those individuals to get a

17  driver's license and insurance, that does not confer citizenship

18  or legal status.

19        MR. LONERGAN:  Certainly.  Certainly.  But it does

20  give people a way of living their lives such that when you are

21  pulled over out of the middle of nowhere with your family in tow

22  and you're approached by un -- by non-uniformed officers who

23  start yelling and swearing at you and reaching their arms into

24  the car, all I'm saying is that the Court can be respectful of

25  both positions here.  The Court can respect the officers'

1  position while also understanding that somebody in Mr. Iraheta-

2  Mercado's situation could be understandably shocked and

3  panicking from what happened.  And if -- if there's an issue

4  that we need to work out with the district judge of whether

5  there's a sanction for that, okay.  But the difference is that

6  the uncertainty is now gone.  Now the process plays out.  And I

7  have to really differentiate that.

8          THE COURT:  But here's how the process is likely to

9  play out.  And I recognize for the purposes of detention, that's

10 not really on the table in the sense of the Ninth Circuit has

11 made clear that if the Executive chooses to prioritize removal

12 from the country over prosecution of some pending but yet

13 unresolved charge, to which Mr. Mercado is presumed to be

14 innocent -- the presumption of innocence applies now -- then if

15 the Executive chooses to emphasize immigration enforcement more

16 than it chooses to emphasize prosecution of the new pending

17 charge, that's -- that's for the Executive to decide.  And if

18 they lose that charge because they remove someone from the

19 country, that's on the Executive.  I just -- that's the --

20 that's the legal framework we have from the Ninth Circuit

21 currently.  But practically, I mean, the reality is if

22 Mr. Mercado -- if I release Mr. Mercado, he almost certainly

23 goes into immigration custody.

24         MR. LONERGAN:  So a few things on that which are

25 important for the Court to understand.  In absentia proceedings,

1  tremendously problematic.  In looking at the data for in

2  absentia, a significant portion of immigrants who are ordered

3  removed for missing court, those orders are later overturned,

4  and the numbers that I could see were --

5          THE COURT:  Regardless of that, even if -- the

6  Executive would, it seems in this climate, likely initiate new

7  proceedings, new immigration proceedings, and I don't think that

8  the chance -- the likelihood of release is very high.

9          MR. LONERGAN:  Well, but it does start the process to

10  give him access potentially to counsel.  Mr. Iraheta-Mercado's

11  family has been here now on four occasions, if I do my math

12  correctly, and they are pursuing immigration counsel to

13  challenge the notice and the opportunity that he had.  Your

14  Honor, about six years ago --

15          THE COURT:  And that can continue, though, if he's

16  detained in this case.  There's nothing that prevents that.

17          MR. LONERGAN:  Well, then, Your Honor, we need to call

18  the -- we can't detain him, though, because he can work on the

19  immigration case while he's detained.

20          THE COURT:  No, no.  That has nothing -- that has

21  nothing -- the other track that the Executive may or may not

22  choose to pursue has nothing to do with the question of

23  detention, but I'm just talking about the practical reality.  I

24  mean, one might argue that Mr. Mercado wants -- would prefer to

25  be released and have an expedited removal because if he were

1  convicted of this offense, that would be an aggravated felony,

2  which would significantly impact immigration proceedings down

3  the road.

4          MR. LONERGAN:  Which is all the more reason why it's

5  important to just call those balls and strikes like I said last

6  time.  And what I -- I really have a concern with, Your Honor,

7  is that there was -- the Court's -- the Court's words last time

8  were just that violence is never an option and it's not

9  something the Court can condone, and yet we saw exactly that

10 with --

11          THE COURT:  In the context --

12          MR. LONERGAN:  -- the allegations --

13          THE COURT:  In the context of arrest.

14          MR. LONERGAN:  Your Honor --

15          THE COURT:  There are people who are charged with and

16 there are people who can resist arrest that could be properly

17 released.  The question here is that the driver of resistance,

18 the driver of fear, the driver of concern on Mr. Mercado's part

19 appears to be the likely -- the possibility of removal by the

20 officers seeking to arrest him.  Whether he's released today or

21 not, that driver is not gone.  That driver remains.

22          MR. LONERGAN:  And I have to disagree with the Court a

23 bit because what we saw with -- and why I'm so concerned about

24 *Hatfield* is you have an individual who is basically waiting to

25 jump into a situation to basically incite it.  I mean, I've

1  watched the video where -- and I believe the Court has as well.

2  This is someone who's looking to pick a fight for a political

3  cause and is using a dangerous weapon against officers --

4       THE COURT:  Belief of anonymity.

5       MR. LONERGAN:  -- in the belief of -- right.  And so

6  -- and so that feeling of political animosity, you know, that

7  gut reaction that would drive somebody to get out of their home,

8  find a mess, find a bike, get to the rally, engage the rally,

9  you know, throw the gas at another officer, that level of

10  violence this Court has said can be managed with release

11  conditions such that --

12       THE COURT:  I think your colleague would describe that

13  -- what he did a lot differently.

14       MR. LONERGAN:  Well, he's not my -- we have a

15  different client.  So but my point is -- my point is

16  understanding the root causes is really important for assessing

17  release.  If you have somebody who by the government's

18  allegation is conspiring to interfere with law enforcement, a

19  deliberate purposeful act that a person could repeat on any

20  given day if they --

21       THE COURT:  None of the people who are charged solely

22  with conspiring to impede, the government didn't seek their

23  detention.

24       MR. LONERGAN:  Understood.  I appreciate that.  But

25  Mikki -- but Mikki Hatfield is on video throwing that --

1          THE COURT:  Right.  He has a similar charge, assault

2  impediment charge.  It's beyond what the other individuals --

3  there were two individuals charged similar to Mr. Hatfield.  The

4  government sought detention of both of those people.

5          MR. LONERGAN:  Right.  And if the Court's looking at

6  that -- that spectrum of violence, violence that's intentional,

7  that's chosen, that's picked, we have to look at where

8  Mr. Iraheta-Mercado is, is grossly on the left of that spectrum

9  where the allegation is -- is largely, from what I can tell,

10 panic, and the Court can see that panic in the video.  Once the

11 -- once that mystery's removed -- and that's some of what Chief

12 Hall is kind of getting at, is, like, hey, let's -- let's put

13 somebody in the middle of this that everybody can kind of say,

14 "We know who you are."  "You're a uniformed police officer."  We

15 don't have that tension of being like, "Is this person here to

16 hurt me?  Who is this person, and why are they here?"  We remove

17 that mystery of what all is going on, and -- and I think that

18 the evidence has to show us that Mr. Iraheta-Mercado is not

19 going to go out there and hurt somebody.  He's not going to go

20 out there and pick a fight.  He stands to --

21         THE COURT:  No, no.  I agree with that.  I agree that

22 Mr. Mercado -- there's no evidence suggesting that if

23 Mr. Mercado is released, he's going to go just commit random

24 acts of violence in the country.  The issue boils down to

25 whether the motivations, the fear of being removed from this

1  country, the motivation to stay with his family -- which I

2  understand those motivations.  But if that motivation is so

3  strong that it would lead Mr. Mercado to do something rash,

4  unreasonable -- flee is also a significant concern.

5       If one flees in a vehicle, that is a danger to himself.

6  It's a danger to others in the community.  It's a danger to law

7  enforcement.  If one were to flee on foot, it's a danger to all

8  those people, too.  If one were to hole up in one's house and

9  arm oneself, those are the concerns because of the significant

10 emotions surrounding the possibility of removal from this

11 country, which I understand those -- why that's -- I understand

12 that emotion around that.  But because that emotion is so

13 heated, it has led other similarly-situated individuals to take

14 rash and extreme actions to avoid that consequence.

15       MR. LONERGAN:  The Court has nothing in the record to

16 suggest that that is the person before it.  Instead, we have

17 somebody --

18       THE COURT:  I have the video, though.  I have the

19 video of law enforcement --

20       MR. LONERGAN:  Sure.

21       THE COURT:  -- officers saying do this, do this, do

22 that, and those commands were not complied with.  Efforts were

23 made to close off the vehicle, and -- and that's concerning,

24 very concerning.

25       MR. LONERGAN:  And I appreciate, right, but that's --

1  we have countless assault charges in our court systems where

2  once that immediate tension is removed, then we look back and

3  just say, okay, this person has no criminal history.  This

4  person has no substance abuse history.  Those --

5          THE COURT:  Here, the -- my concern is the driver that

6  led to that panicked reaction, that concerning reaction is not

7  gone.  It's not going away.  That driver of the potential for

8  removal to this country against one's will remains, and we

9  already have an idea of how Mr. Mercado is going to react when

10 confronted with that possibility.

11         MR. LONERGAN:  Well, the flip side, though, Your

12 Honor, is that he sees that release is an opportunity to show

13 the district court that this conduct was just what we're saying,

14 which is an abhorrent reaction to a vague, uncertain, and -- and

15 ambiguous situation.  I mean, it's the same -- it's the same

16 flip side that we say for every defendant who is released to

17 say, "You now have the opportunity on pretrial to show the judge

18 that this conduct was just a poor choice in the moment."  And I

19 think we see countless defendants who are released with that

20 hope in mind.  When --

21         THE COURT:  And I've released similarly-situated

22 defendants who are facing a 1326 charge, had no criminal

23 history, but when they were apprehended didn't -- didn't resist.

24         MR. LONERGAN:  No, and I appreciate that.  And he will

25 have to deal with whatever the consequences, if any, are from

1  the charge.  But I'm really trying to just convey that this is a

2  context-specific case.

3         THE COURT:  No, I understand that.  And you do, I

4  mean, present a good argument.

5         MR. LONERGAN:  Thank you.  And I think that's why I

6  just -- time -- as time is kind of going on and we're

7  just seeing -- I mean, we've seen for the past few months this

8  escalation.  It really has been a pressure-build.  But now I'm

9  hoping some cooler heads can perhaps prevail with this type of

10 thing, and that's why I have the confidence that I think the

11 Court had with *Hatfield*, which is, like, hey, it's a serious

12 charge.  You know, there was a dangerous weapon that was

13 alleged.  It was spontaneous.  It was a choice, but still

14 deserving of a chance on pretrial release.  Those conditions

15 work.

16     And whatever may come of the immigration -- I mean, I

17 really think we just have to fight that -- that kind of

18 practical concern of, okay, what happens here because that's not

19 part of the calculus.  It's just not.

20        THE COURT:  What's not part of the calculus?

21        MR. LONERGAN:  The -- the detainer on the immigration,

22 and so I just --

23        THE COURT:  No, that's not part -- again, I recognize

24 that because that's the context we find ourselves in.  It

25 doesn't go into the detention calculation.  It just doesn't.

1   And *Santos-Flores* is clear, and I understand -- I understand the

2   reasoning of it.  The Executive controls that.  If the Executive

3   wants to prioritize an immigration proceeding over pending

4   criminal charges, the Executive controls that.  So whether an

5   immigration detainer exists or not -- I don't even know if

6   there's an immigration detainer in this case or not.  It doesn't

7   matter.  I mean, it doesn't matter.

8           MR. LONERGAN:  Yeah.  But I think when you look at the

9   situation, everything that I've seen since our last hearing just

10  from the broader environmentals, from the fact that this was an

11  arrest on a warrant rather than, you know, Lonergan speeding

12  down I-90 and it's not a shock he's getting pulled over and he's

13  got his family in the car, all those perfect storm circumstances

14  really just lined up; officers in plain clothes, their badges

15  kind of obscured.  You can't see Johnson's badge at all for the

16  entire duration.  They're cussing at this family, telling them

17  they don't, pardon my French, have to show them shit.  It was a

18  bad situation.

19      Nothing in this record suggests that Mr. Iraheta-Mercado is

20  going to be dangerous if given the chance to let this process

21  work out right.  You know, his family wants to work through the

22  immigration portion of this.  They will.  You know, I think

23  they've got some significant -- some significant issues that are

24  worth talking to an immigration attorney about.

25      Prior to 2018, even the United States conceded that its

1  notices were grossly deficient.  The Court may remember *Pereira*

2  *versus Sessions* where even the Supreme Court said the notices

3  weren't good.  Institutionally, there are some real problems

4  here.  So when somebody has the opportunity to legitimately

5  fight something and that surprise is no longer there, then

6  everything the Court can set as conditions, we should trust

7  those to work.

8        THE COURT:  Thank you.

9        MR. LONERGAN:  Thank you.

10       THE COURT:  Ms. Wick.

11       MS. WICK:  Thank you, Your Honor.  Okay.  I tried to

12  prioritize these with some sort of order for the Court, and I

13  recognize just right off the beginning there's going to be some

14  comments I have that the Court has already either indicated or

15  asked Counsel about, and so I'll try to minimize those, but I

16  think there's going to be a little overlap between the Court's

17  concerns and the government's concerns in some of these

18  respects.

19       First, speaking to *Hatfield*, despite the sensationalism of

20  *Hatfield* and the circumstance and the public interest in that

21  and all the things, it's not particularly compelling on an

22  apples-to-apples sort of comparison, from the government's

23  perspective.  I think it's significant that the defense motion,

24  for example, chose to quote the government's description in

25  *Hatfield* as deliberate actions to intimidate and threaten versus

1  Defendant's actions in this case reflecting a deliberate

2  consideration of driving away with a person's arm trapped in the

3  window.  And the Court sort of already examined that with

4  defense counsel about the difference between, you know, the

5  rallying around of those individuals involved in the *Hatfield*

6  situation.  And my understanding is that there's not physical

7  injury that resulted in any of the *Hatfield* stuff.  I'm not

8  privy to all of it, but from what I do know and as -- I think

9  the Court might be more privy, to be honest, than myself, I

10  don't believe there's any actual injury, much less the kind of

11  injury was demonstrated in our case.

12      Another thing that makes *Hatfield* different is that

13  Mr. Hatfield's not an alien, and that's important not because of

14  his status but because of the potential for additional violence,

15  additional flight, additional danger -- risk of danger to the

16  community if setting aside the detainer -- like, if we were to

17  assume for a moment that there is no detainer to speak of to

18  worry about and the Court was to release Mr. Iraheta on the

19  record before the Court, there is a very real concern that he

20  would be recontacted, and there is a very real concern that he

21  would again react the same way, if not more promptly do so

22  because of the situation that's pending before the Court now.

23          THE COURT:  And I guess that was my point maybe

24  inarticulately stated, is that my concern here is the stressor

25  -- and I understand the stress.  Mr. Mercado's been in this

1  country for quite some time.  He has family here.  He doesn't

2  want to leave.  I understand that.  I do understand that.  But

3  from the perspective of release and how that would go going

4  forward, my concern is that those stressors and the emotion

5  associated with that that can overcome oneself to do things that

6  may not be in their best interest or those of their family or

7  those of the broader community, that stressor remains regardless

8  of what happens with the immigration case, the in absentia

9  removal or not.  Let's say -- let's assume the in absentia

10 removal is completely invalid.  Mr. Mercado still does not have

11 legal status in this country, and that potential for removal,

12 potential for reinstitution of those proceedings remains.  Those

13 concerns and that emotion all still is there.

14         MS. WICK:  I would agree.

15         THE COURT:  It's kind of like a powder keg.

16         MS. WICK:  And -- and I pointed out it's part of the

17 analysis in general.  It's part of the analysis that's already

18 been before the Court.  But specific to *Hatfield*, that is a

19 significant distinction between the two.  And while the argument

20 from defense is *Hatfield* essentially sought out a fight for

21 political purposes, that is different than someone responding to

22 law enforcement contact with these -- what the Court called

23 drivers initially, right, and these motivations that are a

24 concern.

25         And I would also point out that there was many, many steps

1  in what Mr. Iraheta did.  And I'm sure the Court recalls the

2  video, but there's -- you can see on the video that he actually

3  rolled the window down at one point and then rolled it back up a

4  second time; so it's a very second deliberate choice at that

5  point in time.  He turned the engine over, put it in drive, did

6  not reverse those decisions for some period of time despite

7  repeated orders.

8      When law enforcement was attempting to turn the vehicle off

9  themselves, later trying to remove his seat belt, he was

10 continuing to swat at them and bat their hands away from doing

11 those things.  So it wasn't passive resistance in any stretch of

12 the word there because he wasn't --

13         THE COURT:  This is where Mr. Lonergan was --

14 Mr. Hatfield wasn't passive, either.  He was -- made a

15 volitional choice to toss the smoker back at law enforcement.

16         MS. WICK:  I would agree, but Mr. Hatfield is not an

17 alien.  Mr. Hatfield wasn't contacted in this vehicle, told he

18 had a warrant for his arrest.  And again, my understanding is

19 that there was no physical injury that resulted.  There was

20 significant inconvenience and harm from the, you know, trapping

21 of people in a building for several hours, but Mr. Hatfield's

22 incendiary device, you know, didn't actually present harm in the

23 same way that this case did.

24     And I think there's also some value in considering -- I

25 noted it in reference to characterizing Mr. Iraheta's behavior

1  as panicked, and there maybe have been some panic, and that

2  would be a human part of this case.  But I would also say at the

3  point where he trapped someone's arm in the vehicle and put it

4  on and put it in drive, there was significant concern on the

5  part of law enforcement, and -- and really, that is when things

6  escalated.

7       When one talks about deescalation, the record before the

8  Court is that there was contact made by law enforcement.  They

9  identified themselves many, many times as law enforcement.  The

10 initial contact and request for his identification resulted in

11 Mr. Iraheta turning over his identification.  It is not until he

12 is informed of the warrant for his arrest that the escalation

13 occurred, and it occurred because he refused to comply with

14 directions to exit his vehicle.  So then escalation, especially

15 once the arm is in the window, is a real -- a very real fear,

16 and that is when weapons were drawn.

17      And I would also note about the video when there's

18 characterizations --

19           THE COURT:  Well, what's very concerning to me is that

20 that, in a multitude of cases around the country, has been a

21 basis to use deadly force.  When an officer's trapped on a

22 vehicle, trapped in a vehicle, trapped on a vehicle, trapped on

23 the hood of a vehicle, trapped in the window of a vehicle, that

24 has a been reason to use deadly force.  That may certainly --

25 I'm certainly assuming that's not what Mr. Mercado ever

1  intended, but that doesn't change the fact that those actions

2  lead to a very dangerous situation on the --

3          MS. WICK:  For everybody involved, yes.

4          THE COURT:  Including the broader community.

5          MS. WICK:  Correct.  And I guess I want to remind when

6  we're talking about the circumstances of -- or concerns about

7  deescalation and whatnot, the law enforcement in this particular

8  incident, they did identify themselves many times.  Like I said,

9  their badges were in plain view.  They were not masked.  And so

10 some of the -- while tensions are high, and the government

11 recognizes that, the facts of this case are not as dramatic and

12 are not -- they're not some of the circumstances where people

13 are taking very risky behavior in response to, like,

14 unidentified people and people that could be plain citizens

15 dressed up in mask situations.  And what would be reasonable in

16 that situation is not before the Court, but even if it was, it's

17 different than what we're talking about here, and it still

18 reflects a decision deliberately made on the part of Mr. Iraheta

19 several times.

20     And what I think I was getting to -- and I apologize --

21 when we're looking at his deliberate choices and what they mean

22 for the possibility in the future if he were released and if he

23 were in a situation with law enforcement again, his demeanor

24 after the window was finally down and he's still refusing to get

25 out of the vehicle, he doesn't immediately say or act in any way

1  that demonstrates, "I just panicked, and, okay, you're right.  I

2  need to get out of the vehicle."  He continues to be

3  obstructive.  He continues to physically resist the arrest and

4  pull his arms away.  There's never a moment even later when he

5  is -- where everything is secure, people are transported, he's

6  being advised in detail of the warrant, there's never a moment

7  that suggests any sense of remorse or an awareness of the

8  extremeness of his actions, and that struck me in -- in

9  reviewing the case and considering the very human aspects that

10  are present in this case.

11      The other thought I wanted to address -- and I won't

12  belabor some of the things that the Court's already talked about

13  or asked about -- is there's a reference in the motion to --

14  that detention decisions are relative despite the individualized

15  consideration and that prior and subsequent cases, you know,

16  give us this thing to look to to compare each case to.  And I

17  don't disagree with those concepts, but I would say that there

18  is more out there than just *Hatfield* to look at.

19      There is the *Diaz* case where I believe Your Honor detained

20  that individual two times.  It was appealed to Judge Pennell,

21  who still detained that individual.  I am aware that that

22  individual had criminal history that's not present here.  But on

23  the other side of the coin, it also doesn't have a video that is

24  present here to evaluate the alleged conduct.

25          THE COURT:  Oh, it did.  It had a video, too.

1        MS. WICK:  Pardon?

2        THE COURT:  It had a video, too.

3        MS. WICK:  I might have been misinformed.  Thank you

4   for the correction.  But my point is, still remains, it's out

5   there for the Court to compare it to, as well as the Court's

6   familiarity with other district court decisions in re-evaluating

7   magistrate decisions for detention.  So it's not just this

8   one case of *Hatfield* that we're comparing to.  It's these other

9   situations as well, and particularly cases where someone's life

10  was potentially very much at risk.  All it would've taken is a

11  foot on the pedal and significant harm could've occurred, and

12  Mr. Iraheta was willing to do that with his family in the car is

13  another risk factor in my mind.

14      So I think the magistrate court -- this Court did the right

15  thing in detaining Mr. Iraheta, and I would submit that

16  continued detention is appropriate.

17      THE COURT:  Thank you.

18  Mr. Lonergan, any response?

19      I guess, Mr. Lonergan, the thing I'm -- what I'm concerned

20  about is there is kind of a powder keg of emotion on behalf of

21  Mr. Mercado; and on a human level, I understand that.  He's --

22  you know, he's for a number of years not had any consequences

23  for not having legal status in this country.  That's not his

24  fault, but now that those are, there are consequences for that.

25  There's a reckoning of that -- of that issue.

1    And Mr. Mercado does not want to be removed from this

2  country.  He has family here.  He's made a life here.  He's been

3  employed here.  I totally understand that.  But that doesn't --

4  those emotions -- that powder keg of emotion is not going away.

5         MR. LONERGAN:  I disagree, Your Honor.  I -- I think

6  the Court is right to be concerned about how somebody might feel

7  about this process, but so much of what we know about people is

8  that their behavior changes when they know what is going on.

9  They have an opportunity to fight it.  There's someone there

10  with them fight it and with them through it, and that's the

11  reason we slow down in this court system is to do it right, to

12  give people notice and opportunity.

13    Your Honor, I think the thing that I'm really having a

14  concern is the Court is talking about -- is concerned about the

15  motivation not going away.  Well, but here's the problem, and

16  there's no other way to say this.  Donald Trump is President ten

17  days ago.  He's still President now.

18    Donald Trump is still President when Mikki Hatfield,

19  sitting wherever he was on whatever communication device was

20  being used, started getting those messages, and those messages

21  start simmering.  The simmer is adding to an already sense of

22  hate of what is going on.  And as those messages continue, as

23  whatever the government's going to say is the conspiracy is

24  building, all that emotion is building, building, building,

25  building, building, all for what reason?  Because of a political

1  disagreement.

2      It spills over to a person not just disagreeing, not just

3  writing the editor and saying this is baloney, this is terrible,

4  but getting out, going to a powder keg situation with 20-

5  something-plus people that was explosive, the powder keg

6  situation where that person doesn't just decide, "I'm going to

7  step back.  This is not what I signed up for."  They reach down

8  and pick up a dangerous weapon, throw it back to officers, who,

9  in -- in tremendous restraint, didn't shoot him.

10     And Your Honor, that's something that was decided because

11 of an animus, right, or a political view, and that hasn't

12 changed, either.  That's still what's going on.  It's still

13 happening every day, and that potential could blow over

14 tomorrow, a week from now, three months from now as someone goes

15 through the legal process.  So if we're going call

16 motivations --

17         THE COURT:  Yeah, but I can give him a GPS condition,

18 I can impose a number of conditions on him that limit that

19 availability for those emotions to come roaring back.

20 Mr. Mercado carries with him that strong desire, wherever he

21 goes, not to be removed from this country.  Again, I understand

22 it.

23         MR. LONERGAN:  Well, and --

24         THE COURT:  That -- that powder keg is there no

25 matter -- no matter what conditions of release I impose.

1         MR. LONERGAN:  So what is the -- let's talk about what

2    is the powder keg for --

3         THE COURT:  I don't want -- I don't want -- I really

4    don't to be removed from this country.

5         MR. LONERGAN:  And what's the powder keg for Mikki

6    Hatfield?

7         THE COURT:  Sooner or later, some law enforcement --

8    there's a high likelihood that some law enforcement officer, if

9    he were convicted in that case, it could be this case, it could

10   be the marshals.  If he is released in this case and not taken

11   into ICE custody, it could be ICE officers coming to initiate a

12   new removal proceeding.  All of those things are going to -- and

13   they are not things that Mr. Mercado controls.  They're going to

14   happen without warning, without notice.

15        MR. LONERGAN:  So I disagree with the Court.  I think

16   that there is warning and there is notice now.

17        THE COURT:  There is with regard to the marshals.

18        MR. LONERGAN:  And I think there's across the board,

19   though.  Like, look, if he's getting a door -- if he's getting a

20   knock on a door, he's been through this.  He is -- there is some

21   desensitization and notice that comes from this whole process.

22   I mean, it's being interpreted to him, Your Honor.

23        But here's the problem that I have, which is -- which is

24   the Hatfield powder keg.  What was the powder keg?  If we had to

25   just sort of step back and think about what it is that hasn't

1 been controlled with someone in, say, *Hatfield* speech, what the

2 Court can't control is all the constant communications, all the

3 rumblings, all the seething that comes from youth fueled by

4 political feeling in these chat rooms with anonymity, with

5 spontaneity.

6         THE COURT:  And that's --

7         MR. LONERGAN:  None of that --

8         THE COURT:  That's what Mr. Hatfield lacks now.  He

9 had that -- he thought he had anonymity when he went to the

10 demonstration.

11         MR. LONERGAN:  He has anonymity every day on the

12 worldwide web just as --

13         THE COURT:  But I'm not worried about him sitting on

14 the worldwide web and posting things.  I'm worried about a

15 repeat of what occurred at the initial charged incident.

16         MR. LONERGAN:  Which all starts from that seething of

17 people talking about these things, just the vitriol that we see

18 on both sides of the aisle with these issues.  I mean, it's just

19 -- it's -- it's what we see with -- with terrorism cases.  I

20 mean, this is what we've learned through counter-insurgency and

21 whatnot is it all -- so much of this starts at a ground level

22 that we can't control.

23         And that's my point here is that you have somebody who has

24 demonstrated a spontaneity, deliberate, and none of that's --

25 none of those risk factors, none of that kindling, none of that

1  potential ignition source have changed.

2      But for Mr. Mercado, I'd say they substantially have

3  because, No. 1, the Court has advised him several times now that

4  there is the possibility that this isn't done if/when he were to

5  be released.  He has the strong incentive of showing that what

6  happened was a mistake by officers who -- I disagree with the

7  United States over how well and plainly they came over.

8      They were not speaking Spanish.  They were speaking

9  English, and he clearly was struggling to understand with what

10 was going on.  He was getting competing instructions from

11 officers on his left, officers on his right.  Again, one, you

12 couldn't see the guy's badge.  The other, you can barely see the

13 badge, and you have that because you have the benefit of -- of

14 being in the backseat watching this.  And if I'm like this, I

15 can't necessarily see this.

16     So Mr. Iraheta-Mercado has a very different calculus at

17 this point with being advised that, hey, this is not done.

18 There could be a few sequels that come from this from other

19 people coming to see him.  And I think that if the Court's going

20 to trust the process to work for deliberate incitement, then it

21 needs to give the same chance to somebody who has never, by any

22 stretch of what we've seen in evidence, hurt a fly other than a

23 volatile situation that probably all sides could've handled

24 better.  That's the -- that's the gist of the argument, Your

25 Honor.

1         THE COURT:  Well, thank you for your presentation.  I

2   understand your argument.

3         I think it's imperative for me to review that video again;

4   so I'm going to do that, and I'll get an order out.  The

5   detention order -- the written order from the prior hearing

6   should be docketed now.  If it's not yet, it will be docketed

7   today.  It's a --

8         MR. LONERGAN:  I think there was one.

9         THE COURT:  Yeah.  It's been submitted to the Clerk's

10  Office so -- I've just been out of the district for a few weeks.

11  So that order will be in place.  That order remains in place.

12  I'll take your order to reopen -- or reconsider, I think it's

13  fashioned as, under advisement.  But I'll get a -- get a

14  decision certainly by the end of the week.

15        But I think it's incumbent -- Ms. Wick emphasized, rightly

16  so -- the video.  So, you know, I haven't reviewed the video for

17  a couple of weeks since the last hearing.  I want to review that

18  video again and put that in context of the government's

19  presentation and your argument.

20        MR. LONERGAN:  Thank you, Your Honor.

21        THE COURT:  All right.  Thank you.

22      Thank you.  I appreciate the arguments on both sides, and,

23  again, I'll -- I know that if I determine that the detention

24  order stands, I want to give you an opportunity to expeditiously

25  seek review.  I don't -- I can't remember which district judge

1  this is.  I think it's Judge --

2          MR. LONERGAN:  Judge Dimke.

3          THE COURT:  I want to give you an opportunity for

4  expeditious review; so I will resolve the -- the motion to

5  reconsider before the end of the week and get a written order in

6  place.

7          MR. LONERGAN:  Thank you, Your Honor.

8          THE COURT:  Now, if I order release, would the

9  government want it stayed?  I imagine so.

10          MS. WICK:  That's correct, Your Honor.

11          THE COURT:  All right.  So either way, we'll allow

12  either party, if it deems it appropriate, regardless of my

13  decision, to seek further relief.

14          MR. LONERGAN:  Perfect.  Thank you, Your Honor.

15          THE COURTROOM DEPUTY:  Please rise.

16          (Court adjourned on July 28, 2025, at 3:07 p.m.)

17

18

19

20

21

22

23

24

25

C E R T I F I C A T E

I, ALLISON R. ANDERSON, do hereby certify:

That I am an Official Court Reporter for the United States District Court for the Eastern District of Washington in Spokane, Washington;

That the foregoing proceedings were taken on the date and at the time and place as shown on the first page hereto; and

That the foregoing proceedings are a full, true, and accurate transcription to the best of my ability after listening to the official electronic sound recording of the requested proceedings, duly transcribed by me or under my direction.

I do further certify that I am not a relative of, employee of, or counsel for any of said parties, or otherwise interested in the event of said proceedings.

DATED this 26th day of August, 2025.


ALLISON R. ANDERSON, RMR, CRR
Washington CCR No. 2006
Official Court Reporter
Spokane, Washington